601 F.2d 809
 INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS OF ATLANTA
et al., Plaintiffs-Appellants,
v.
Reginald EAVES, Atlanta Police Department Commissioner,
individually and in his official capacity,
Defendant-Appellee.
 No. 77-1284.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 30, 1979.
 
 Barry A. Fisher, Beverly Hills, Cal., for plaintiffs-appellants.
 Ferrin Y. Mathews, J. M. Harris, Jr., Atlanta, Ga., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before GOLDBERG, SIMPSON and CLARK, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 I.
 
 1
 In this case we are asked to decide the constitutionality of a municipal ordinance that regulates the distribution of literature and solicitation of funds at airports owned by the city of Atlanta, Georgia. The International Society for Krishna Consciousness, Inc., (the Society) and William G. Ogle, president of the Society's Atlanta Branch, claim that the ordinance violates their first amendment rights. They sued the Atlanta chief of police for declaratory and injunctive relief; when the United States District Court for the Northern District of Georgia refused to grant a preliminary injunction,[1] they brought this appeal.
 
 A.
 
 2
 The ordinance is not complex.[2] Any person or organization wishing to distribute literature (§§ 1, 3) or to solicit funds (§ 11) at the Atlanta airport must obtain a permit from the Commissioner of Aviation. Appellants originally challenged the detailed provisions governing the grant and denial of permits, but since the appeal was filed Atlanta has amended the ordinance and modified the provisions to which appellants objected.[3] This portion of the appellants' claim is therefore moot. See, e. g., Kremens v. Bartley, 431 U.S. 119, 129, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977).
 
 
 3
 The ordinance then divides the airport into five "areas" and requires that the permit specify the areas within which a permit holder may solicit funds and distribute literature. §§ 7, 8, 15, 16. Certain parts of the airport for example, "(b)eyond the security check points," and "(w)ithin ten (10) feet of any area leased exclusively to a tenant of the Airport," §§ 6(a), (c) and 14(a), (c) are off limits in any event. The appellants do not challenge any of these provisions. But the ordinance goes on to provide that
 
 
 4
 The Commissioner may move such permitted activities from one area to another and among the different areas upon reasonable written notice to the applicant when in the judgment of the Commissioner such move or moves are necessary to the efficient and effective operation of the transportation function of the airport.
 
 
 5
 § 8. The ordinance also provides that if two or more persons or organizations seek to distribute literature or solicit funds at the same time, "the Commissioner shall apportion the available areas between or among them all on as equitable a basis as possible," §§ 8, 16. Moreover, the ordinance allows no more than three persons to solicit funds or distribute literature in any one "area" at the same time, and
 
 
 6
 (w)hen the Commissioner receives more applications for permits than he is able to grant by following this rule, then he may impose such reasonable and equitable restrictions as to allowable dates or hours or numbers of participants as may reasonably be required to provide fair and as equal as possible opportunities for all applicants, while insuring the efficient and effective operation of the transportation function of the Airport.
 
 
 7
 §§ 8, 16. The appellants claim that the vagueness of this language gives the Commissioner unconstitutionally broad discretion to deny and condition permits.
 
 
 8
 The ordinance also limits the activities of those who hold valid permits. The appellants challenge two of these limits. Section 9(a) specifies that no person may "obstruct, delay or interfere with, or seek to coerce or physically disturb" another person, or "hamper or impede the conduct of any authorized business" at the airport. Appellants charge that this provision is unconstitutionally vague and overbroad. Sections 9(c) and 16 impose a more novel restriction. Permit holders may distribute literature and proselytize throughout the area specified in their permit, but they may not "(r)eceive or accept any donation of money", § 9(c), except at certain " 'Solicitation Booths' which shall be furnished by the Commissioner . . . and . . . shall be located within the permissible areas at such points as may be designated from time to time by the Commissioner" § 16. The appellants say that the first amendment prohibits Atlanta from limiting the transfer of funds to certain locations in this fashion.
 
 
 9
 Finally, any person convicted of violating these or other prohibitions contained in the ordinance loses his or her permit and right to distribute literature or to solicit funds in the Atlanta airport, and cannot receive another permit for twelve months. § 18(a), (c). Moreover, if persons "representing" a single organization, § 18(b), violate the ordinance a total of three times within six months, that organization loses any permit it holds and cannot reapply for twelve months. § 18(b), (c). The appellants challenge these penalty provisions as well.
 
 
 10
 In summary, then, the appellants raise five challenges: to the alleged vagueness of the rules permitting the Commissioner to move permit holders from one area to another; to the alleged vagueness of the criteria the Commissioner is to apply when allocating space among competing applicants; to the alleged vagueness and overbreadth of the provision prohibiting obstructing, interfering, and the like; to the requirement that money be transferred only at specified solicitation booths; and to the penalty provisions.
 
 B.
 
 11
 The district court found that the Society is a religious group within the meaning of the first amendment, and that the religion "imposes on its members the duty to perform a religious ritual known as Sankirtan, which consists of soliciting and accepting donations and contributions while disseminating religious literature and information, all in public places." R. at 149. Neither of these findings is questioned by the appellee. Members of the Society have apparently obtained permits to distribute literature and to solicit funds in the Atlanta airport and are currently doing so. Apparently they are complying with all the provisions of the ordinance. Moreover, so far as we can tell from this record, no one has ever been charged with violating the ordinance, and it has never been applied or interpreted by any state court. Appellants' challenge to the various provisions of the Atlanta ordinance is, therefore, anticipatory in two senses; none of the provisions has actually been enforced against them, and they do not allege that they have yet engaged in any conduct punished or otherwise proscribed by the ordinance. Like most anticipatory challenges, appellants' suit raises serious questions of justiciability, and we must first decide which of their claims is justiciable.
 
 II.
 
 12
 Justiciability is a notably amorphous notion, "a concept of uncertain meaning and scope." Flast v. Cohen, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968). It has at least two distinct components. One is jurisdictional, the Article III requirement that federal courts decide only "cases" and "controversies." The other consists of "policy considerations," Id. at 97, 88 S.Ct. 1942, not specified in the Constitution but bearing on whether it is appropriate to permit a particular case to be litigated in a federal court at a particular time. See generally Socialist Labor Party v. Gilligan, 406 U.S. 583, 588-89, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972). This component is "not always clearly distinguished from the constitutional limitation." See Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953).
 
 
 13
 The constitutional requirement of a case or controversy is rooted in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). It is an especially crucial limit on the power of a federal court faced with an anticipatory challenge like appellants'. "The power and duty of the judiciary is in the final analysis derived from its responsibility for resolving concrete disputes brought before the courts for decision . . . . Marbury v. Madison . . . . But this vital responsibility, broad as it is, does not amount to an unlimited power to survey the statute books and pass judgment on laws . . . ." Younger v. Harris, 401 U.S. 37, 52, 91 S.Ct. 746, 754, 27 L.Ed.2d 669 (1971); See Broadrick v. Oklahoma, 413 U.S. 601, 610-11, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803). In other words, a plaintiff must not be allowed to enlist the aid of a federal court in a general effort to purge unconstitutional measures from the body of the law. See, e. g., United States v. Richardson, 418 U.S. 166, 173, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); Boyle v. Landry, 401 U.S. 77, 81, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971). To say this is not by any means to suggest that we should be hostile to anticipatory challenges; they play a most vital role in modern efforts to enforce constitutional rights. "It is not necessary that (a party) first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." Steffel v. Thompson, 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974). But the premise of Marbury v. Madison requires us to insist that an anticipatory challenge to statute's constitutionality grow out of a "real, substantial controversy between parties . . . a dispute definite and concrete." Babbitt v. UFW, --- U.S. ----, ----, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979), Quoting Railway Mail Association v. Corsi, 326 U.S. 88, 93, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945).
 
 
 14
 In deciding whether such a dispute exists, courts have traditionally focused on each of the parties in turn. They have asked whether the plaintiff is seriously interested in disobeying, and the defendant seriously intent on enforcing, the challenged measure. Some courts have held that no case or controversy exists if either of these elements is missing. See, e. g., Rincon Band of Mission Indians v. County of San Diego, 495 F.2d 1, 4-6 (9th Cir.), Cert. denied, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). But we think the second aspect of this inquiry focusing on the probability of enforcement is relevant only to the non-jurisdictional, "policy considerations" underlying justiciability and not to the existence of a case or controversy.[4] There are, to be sure, several important reasons for insisting on some significant likelihood that the defendant government will enforce the statute if it is violated. A defendant uninterested in enforcing a statute is less likely to provide a vigorous defense of its constitutionality, See generally Poe v. Ullman, 367 U.S. 497, 501-02, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (plurality opinion); See also Singleton v. Wulff, 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1975); prosecutors should be permitted, and perhaps encouraged, to refuse to enforce unconstitutional laws, See e. g., Ex parte La Prade, 289 U.S. 444, 458-59, 53 S.Ct. 682, 77 L.Ed. 1311 (1933); See also Spomer v. Littleton, 414 U.S. 514, 94 S.Ct. 685, 38 L.Ed.2d 694 (1974); and for related educative reasons, challenges to laws that have fallen into disuse should be directed to the political branches, with the judiciary intervening only after the other branches reexamine and reaffirm such measures by resuming enforcement.[5] But these do not appear to be jurisdictional arguments; they do not speak to the concerns of the premise derived from Marbury v. Madison.[6] Indeed there is clear Supreme Court authority that the probability of enforcement is not relevant to a court's jurisdiction over an anticipatory challenge. Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), was an appeal of right under 28 U.S.C. § 1257(2) from a state court's dismissal of an anticipatory challenge. The statute under attack prohibited public school teachers from teaching evolution. The Court noted that "(t)here is no record of any prosecutions in Arkansas under its statute. It is possible that the statute is presently more a curiosity than a vital fact of life . . . ." Id. at 101-02, 89 S.Ct. at 269. Nevertheless, the Court accepted jurisdiction and apparently believing that § 1257(2) required it to decide all appeals of which it had jurisdiction and precluded it from denying review for "policy" reasons[7] reversed on the merits. The Supreme Court, like every federal court, is of course limited by Article III. Thus Epperson implicitly holds that the probability of a statute's being enforced, however important it is to the non-jurisdictional, "policy" component of justiciability, is not relevant to whether an anticipatory challenge presents a case or controversy sufficient to establish federal jurisdiction.[8]
 
 
 15
 When we decide whether a case or controversy exists, then, we must focus on the plaintiff's interest in "engag(ing) in a course of conduct, arguably affected with a constitutional interest, but proscribed by a statute." Babbitt v. UFW, --- U.S. ----, ----, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (1979). While many varieties of plaintiffs can qualify to raise anticipatory claims, See e. g., Doran v. Salem Inn, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), the Supreme Court has been most willing to allow anticipatory claims by plaintiffs who allege that they wish to violate the challenged statute because of their active membership in some profession or organization that has goals apart from the extirpation of unconstitutional measures. Compare Babbitt v. UFW, --- U.S. ----, ----, 99 S.Ct. 2301, 2309-10, 60 L.Ed.2d 895 (1979); Buckley v. Valeo, 424 U.S. 1, 7-8, 12 & n. 10,96 S.Ct. 612, 46 L.Ed.2d 659 (1976); United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 551-53, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (decided on merits without discussing jurisdiction); Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); Lake Carriers' Association v. MacMullan, 406 U.S. 498, 506-07, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); And Epperson v. Arkansas, 393 U.S. 97, 100-02, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), With Steffel v. Thompson, 415 U.S. 452, 459-60, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), And Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (plaintiff's longstanding concern with issue, by itself, is insufficient to confer jurisdiction). The Court has never been explicit about this practice, but the reasons for it are clear. If we are to be faithful to the premise derived from Marbury v. Madison, we cannot always be satisfied by a plaintiff's formal allegation that he wishes to violate the challenged statute, for such an allegation could be honestly made by a plaintiff interested only in sweeping unconstitutional legislation from the statute books. See generally Laird v. Tatum, 408 U.S. 1, 13-15, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). We can be most certain that a constitutional challenge grows out of a genuine dispute and is not a contrivance prompted solely by a desire to enforce constitutional rights if we know that the allegedly unconstitutional statute interferes with the way the plaintiff would normally conduct his affairs. Of course anticipatory challenges should be allowed in a variety of other circumstances. But usually it is sufficient, although not necessary, that the plaintiff have a role in an organization dedicated in part to activities proscribed by the challenged statute and assertedly protected by the Constitution.A.
 
 
 16
 We can now turn to appellants' particular claims. Two of these claims pose few jurisdictional problems. Appellants assert that Atlanta cannot constitutionally require that they accept donations only at certain "Solicitation Booths." §§ 9(c), 16. Appellants say that this requirement does more than inconvenience them; fairly construed, their complaint alleges that fidelity to their religious duty requires them to solicit aggressively and without inhibition. Therefore, appellants claim, the Constitution entitles them to solicit funds at least in any part of the airport where they are allowed to distribute literature and proselytize.
 
 
 17
 Second, appellants argue that § 9(a) is vague and overbroad. Section 9(a) makes it illegal for a permit holder to "obstruct, delay, or interfere with the free movements of any other person . . . or hamper or impede the conduct of any authorized business at the Airport." Appellants say that this provision is replete with unconstitutionally imprecise terms "obstruct," " delay," "interfere," "free movements," "hamper," "impede." Fairly read, their vagueness claim is that these terms have forced them to steer wide of any possible violation lest they be unwittingly ensnared. See, e. g., Baggett v. Bullitt, 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1969), Citing Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). In other words, they assert that they have had to leaflet and solicit far less aggressively than they otherwise would, in order to avoid being accused of "impeding" or "hampering" others. Alternatively, appellants say, these terms are overbroad; if they do have a precise meaning, that meaning includes activities that Atlanta cannot constitutionally proscribe. As we have said, both of these claims are anticipatory because appellants have not yet violated the ordinance to test their asserted constitutional rights. That is, they have not yet accepted money away from the solicitation booths or engaged in the sort of conduct that they fear may be prohibited but cannot be certain is prohibited by § 9(a). Instead, they say, they have trimmed their sails.
 
 
 18
 Judged by the standards we elaborated, appellants' interest in bringing these two anticipatory claims is jurisdictionally impeccable. The district court found that the Society's members are under a religious duty to distribute literature, solicit funds, and proselytize. The Society asserts, without contradiction, that at other times and in other places it aggressively solicited funds and distributed literature. Members of the Society currently distribute literature, proselytize, and solicit funds as aggressively as Atlanta permits. Plainly, appellants have an interest in escaping the solicitation booths, and in knowing exactly how far they can go without being punished, that is independent of any desire to enforce the Constitution.[9]
 
 
 19
 The non-jurisdictional, "policy" component of justiciability is less focused than the Article III requirement. To apply it we must respond to "many subtle pressures, including the appropriateness of the issues for decision" by the federal district court "and the actual hardship to the litigants of denying them the relief sought." Poe v. Ullman, 367 U.S. 497, 508-09, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961) (plurality opinion). See also Socialist Labor Party v. Gilligan, 406 U.S. 583, 588-89, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972); Toilet Goods Association v. Gardner, 387 U.S. 158, 162, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) ("ripeness" for review of federal administrative agency's action). Appellants' challenges to the solicitation booths provisions and to § 9(a) also satisfy the requirements of this component.
 
 
 20
 To begin with, several policies suggest that we should generally be receptive to anticipatory challenges; they apply, with perhaps more force than usual, to appellants' attacks on the solicitation booths and on § 9(a). To insist that a person must break the law in order to test its constitutionality is to risk punishing him for conduct which he may have honestly thought was constitutionally protected. Not only is this prima facie unfair, but it discourages people from engaging in protected activity and enforcing constitutional rights. In a case like this, where the appellants claim that the challenged ordinance deters them from practicing their religion, the injury to their first amendment rights recurs each day and is, in a sense, irreparable. See Dombrowski v. Pfister, 380 U.S. 479, 486-87, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Baggett v. Bullitt, 377 U.S. 360, 378-79, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).
 
 
 21
 Other policy concerns also suggest that appellants' claims against the solicitation booths and § 9(a) are justiciable. One of these, as we have mentioned, is the probability that the challenged provisions of the Atlanta ordinance will be enforced against the appellants if they violate it. Appellants need cross only a low threshold; the Supreme Court requires no more than a "credible threat of prosecution," Babbitt v. UFW, --- U.S. ----, ----, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (1979), one that is not "chimerical," Poe v. Ullman, 367 U.S. 497, 508, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (plurality opinion) or "imaginary or speculative," Younger v. Harris, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), "some reason (for) fearing prosecution," Babbitt v. UFW, --- U.S. ----, ----, 99 S.Ct. 2301, 2311, 60 L.Ed.2d 895 (1979). We have no doubt that appellants' challenge to § 9(a) and the solicitation booths provisions meet this standard. The parties disagree about whether the airport authorities specifically threatened to enforce the ordinance, but the ordinance was enacted only months ago and we are probably entitled to assume that law enforcement agencies will not disregard such a recent expression of the legislature's will. Cf. Buckley v. Valeo, 424 U.S. 1, 12, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (conclusory finding of jurisdiction in anticipatory challenge to recently enacted statute). In an evident attempt to assure that it will be valid and enforceable, Atlanta's city council amended the ordinance in response to the district court's decision, See note 1 Supra, that certain portions of an earlier version were unconstitutional. Airport authorities have issued permits and set up solicitation booths. In all these ways, Atlanta shows every sign that it is planning to enforce the ordinance seriously.
 
 
 22
 The Supreme Court has also suggested that a court may declare an anticipatory challenge not justiciable in order to "delay resolution of constitutional questions until a time closer to the actual occurrence of the disputed event, when a better factual record might be available." Blanchette v. Connecticut General Insurance Corps. (Regional Rail Reorganization Act Cases), 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974); See Babbitt v. UFW, --- U.S. ----, ----, 99 S.Ct. 2301, 2310, 60 L.Ed.2d 895 (1979); United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Neither appellants' attack on the solicitation booths provisions nor their challenge to the alleged vagueness and overbreadth of § 9(a) falls into this category, however. Atlanta began requiring solicitation booths after it had had some experience with allowing donations to be given and accepted throughout the airport; the Atlanta authorities' impressions of the lessons of the experience are in the record. See pp. 828-829 Infra. By the time this suit came before the district court, the solicitation booths had apparently been operating for some time; evidence about their workings was available. Moreover, appellants attack the solicitation booths provision on its face. As we shall discuss, See pp. 826-830 Infra, they say that allowing money to be accepted only at booths restricts their religious freedom and that Atlanta cannot constitutionally distinguish between accepting donations and other forms of expression. They do not, for example, attack the particular locations of the booths. Efforts to resolve such a facial challenge will gain little from a more complete record.
 
 
 23
 Similarly, appellants challenge the allegedly vague and overbroad § 9(a) on its face. Heuristically, we might be aided by a real illustration of borderline conduct, neither plainly proscribed nor plainly permitted by § 9(a); as it is, we must rely on appellants' hypothetical examples. But this is a minor drawback, and in any event considering § 9(a) in the abstract has its heuristic advantages, too. It makes us more able to appreciate the quandary, if indeed it is a quandary, that appellants face when they attempt to plan their activities; they, after all, have only the abstract terms of the ordinance to guide them. And there are additional policy reasons for allowing the challenge to § 9(a) to be heard now. Something will be gained, See pp. 830-831 Infra, but much will be lost if we permit "the contours of regulation to be hammered out case by case," Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965), in a series of enforcement proceedings, as state courts gloss the allegedly vague terms to render them precise, See, e. g., Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), or as the enforcement agencies provide § 9(a) with a patina of "less formalized custom and usage," Parker v. Levy, 417 U.S. 733, 754, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); See Hynes v. Mayor of Oradell, 425 U.S. 610, 622 n. 6, 96 S.Ct. 1755, 48 L.Ed.2d 243; See also Ehlert v. United States, 402 U.S. 99, 105, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971). While the "hammering out" continues so do the vices of vagueness; the appellants' uncertainty about the reach of the ordinance will force them to continue to restrict their religious activities. Moreover, if we believe that the ordinance's vagueness can be cured by a reasonable construction, we can, in several ways, refrain from invalidating it. We can abstain and allow a state court, if it wishes, to interpret the ordinance in a way that corrects its constitutional defects. But see Baggett v. Bullitt, 377 U.S. 360, 378-79, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). Or we may be able to construe the statute ourselves, if there is only one plausible saving construction, See Universal Amusement Co. v. Vance, 587 F.2d 159, 166-67 (5th Cir. 1978) (en banc), or if we can anticipate what a state court would do by "extrapolating" from its decisions in related or analogous cases. See generally Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).
 
 
 24
 Another policy argument affirmatively favors entertaining a vagueness claim like appellants' challenge to § 9(a). All vague statutes are unacceptable partly because they "encourage( ) arbitrary and erratic arrests and convictions," Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1971) and "arbitrary and discriminatory application," Grayned v. City of Rockford, 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); similarly, vague measures regulating first amendment freedoms enable low-level administrative officials to act as censors, deciding for themselves which expressive activities to permit. The very existence of this censorial power, regardless of how or whether it is exercised, is unacceptable. That, at least, seems to be the lesson of the series of Supreme Court decisions striking down statutes that allow officials excessively wide discretion to grant or deny permits to engage in activities protected by the first amendment. See, e. g., Cox v. Louisiana (I), 379 U.S. 536, 555-75, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Cantwell v. Connecticut, 310 U.S. 296, 305-06, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). In these cases the Court has considered it immaterial whether the official who denied a permit acted reasonably, whether a permit could legally have been denied under a narrower statute, or indeed whether the party challenging the measure even applied for a permit. See Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151 & n. 3, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (collecting cases). In other words, in the first amendment area, the Court will invalidate an excessively broad grant of discretion on its face. But if the Court were concerned merely about officials' abusing their wide discretion, it need not have chosen this facial approach; it could have struck down the abuses when they arose. See, e. g., Poulos v. New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953). By facially invalidating excessively broad grants of discretion, then, the Court has revealed that the problem is not potential abuses but the very existence of broad, censorial power.[10] As we have said, a vague statute creates a similar power, and it is equally unacceptable; since the very existence of the power is unacceptable, there is little reason to forbear entertaining an anticipatory challenge in order to allow that power to be exercised. For these reasons, appellants' claim that § 9(a) is invalid, like their challenge to the solicitation booths, is justiciable.
 
 B.
 
 25
 Appellants' attack on the penalty provision of the ordinance, § 18, presents a much closer question. Section 18 provides that the violation of any part of the ordinances is an "offense," and that any individual convicted of this offense loses the right to distribute literature or solicit funds in the airport for twelve months. If people "representing" an organization violate the ordinance a total of three times within six months, that organization loses its permit for twelve months. It might be argued that those penalty provisions do not Currently injure the Society or any of its members. Section 18 imposes no penalties until the Society's members violate some other provision, and so far, according to this record, they have violated none. Thus even if the § 18 penalties are unconstitutional, the appellants cannot complain of having suffered them. Moreover, the argument would continue, the appellants cannot complain that § 18 has deterred them from doing anything they have a right to do. As long as any other unconstitutional prohibitions in the ordinance are invalidated, appellants have no constitutional right to violate it; therefore being deterred from violating it cannot count as an injury, so even if § 18 deters appellants it does not injure them. There will be no injury, it might be argued and therefore no case or controversy until members of the Society are actually convicted of a violation and punished under § 18. At that time, the argument would conclude, they can attack the constitutionality of the penalty provision, but not before.
 
 
 26
 This argument is abstractly persuasive and may be entirely correct in other contexts. But it is insufficiently sensitive to the first amendment interests at stake here, and it does not take account of the practical organizational difficulties faced by any group like the Society. The appellants are entitled to exercise their first amendment rights vigorously and aggressively and to go to the limits of the law in preaching, proselytizing, leafletting, and soliciting. One who goes to the limits, of course, is more likely to transgress them inadvertently than one who leaves some margin. One who goes to the limits is also more likely to be thought to have transgressed them even if he or she has not. The threat of a severe punishment, therefore, is likely to deter members of the Society from pressing their religious views as forcefully as they otherwise might; it is likely to induce them to leave some room for error. The Society's leadership will make similar calculations. When they organize and deploy their devotees, they know that a certain number are likely to be convicted, eventually, of some infraction, either because they deliberately or negligently violated some provision or because others are mistakenly convinced that they did. If the Society knows that it will be penalized for those violations, it will alter its designs, probably again by making them less aggressive. Of course, Atlanta is free to impose any constitutional penalty on those who violate its ordinances, even if the prospect dampens the enthusiasm of those engaged in expressive activities. But Atlanta cannot use an unconstitutional punishment for this purpose. Since the threat of punishment under § 18 does affect appellants' conduct, by causing them to exercise their first amendment rights less forcefully than they otherwise would, appellants have shown the injury necessary to Article III jurisdiction. If we were to hold § 18 unconstitutional, the threat, and thus the injury, would be removed. Therefore there is a case or controversy.[11]
 
 
 27
 Policy considerations also counsel us to hold that appellants' challenge to the penalty provisions is justiciable. As our discussion of the merits shows, See pp. 832-833 Infra, appellants attack Atlanta's use of the empirical generalization that one who violates the ordinance on several occasions is likely to violate it again; first amendment rights, they say, cannot be restricted on the basis of such a premise. They need not claim that this premise is generally untrue, much less that it is untrue in any one case. Under these circumstances, waiting for the issue to be framed by the concrete facts of a particular real case will probably not aid our decision and may even distract.[12]
 
 C.
 
 28
 Appellants' remaining two challenges, to §§ 8 and 16, are not justiciable. Taken together, these sections authorize the Commissioner of Aviation to apportion airport space and time among competing applicants "on as equitable a basis as possible." If necessary, the Commissioner may restrict both the times at which groups may use their permits and the number of adherents who may solicit or distribute literature. These restrictions must be "reasonable and equitable" and must "provide fair and as equal as possible opportunities for all applicants, while insuring the efficient and effective operation of the transportation function of the Airport." Appellants insist that terms like "reasonable," "equitable," "efficient and effective operation," and "fair and as equal as possible" are too vague and give the Commissioner essentially unlimited discretion to circumscribe their activities.
 
 
 29
 We do not see how appellants are injured by this alleged vagueness. The Commissioner's discretion, however excessive, does not exist until competing applicants appear; nothing in this record suggest that they have appeared or will appear.[13] The appellants do not allege that the Commissioner has ever been able to invoke his authority, or that he can invoke it now.[14] The contingent possibility of excessively broad discretion to regulate first amendment activity unlike its actual existence, See pp. 822-823 Supra cannot injure appellants. Nor do we see how this contingent discretion, if indeed §§ 8 and 16 confer it, affects appellants' conduct. Because appellants do not allege that competing applications have been filed or will soon be filed, they allege no injury, and this claim presents no case or controversy.
 
 
 30
 Appellants pose a more troublesome challenge to a provision of § 8 that gives the Commissioner a general authority to relocate permitted activities. It says that the Commissioner, after giving "reasonable written notice" to the holder of a permit, may "move (the) permitted activities from one area to another and among the different areas." He may do so only if "in the judgment of the Commissioner such move or moves are necessary to the efficient and effective operation of the transportation function of the airport." Appellants' claim is that the language "necessary to the efficient and effective operation of the transportation function" is so imprecise that again the Commissioner has virtually unlimited discretion to move them. Appellants do not allege that the Commissioner acts or will act in bad faith, so they cannot say that their activities are inhibited by the fear that he may harass them by relocating them frequently. Nevertheless, as we suggested, See pp. 822-823 Supra, Supreme Court decisions invalidating statutes that grant excessive administrative discretion in the first amendment area suggest that the mere existence of broad, discretionary, censorial power itself injures those who wish to speak. To be sure, discretion to move a speaker is different from discretion to silence him or her, at least if there is no bad faith. But being moved about the airport may significantly affect the Society's ability to proselytize and solicit. For this reason we hold that this allegedly broad discretionary authority stemming from § 8 injures the appellants enough to create a case or controversy.
 
 
 31
 But § 8 also requires the Commissioner to give a permit holder reasonable notice before requiring a move. If the Commissioner ever proposes to relocate the appellants, then, they will be able to challenge his decision before they sustain any further, concrete harm. In such a case, moreover, a court would have before it the Commissioner's specific explanation of why a particular move promoted the "efficient and effective operation of the transportation function." It is not at all obvious that this language confers excessively broad discretion on the Commissioner. See e. g., Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). Therefore an explanation from the Commissioner in a particular case would better enable us to decide whether § 8 does indeed realistically confine the Commissioner's discretion. For these reasons, we hold, as a matter of policy, that appellants' challenge to § 8 is not justiciable. See generally United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).
 
 III.
 
 32
 We can now proceed to the merits of the justiciable claims.
 
 A.
 
 33
 First we consider appellants' assertion that Atlanta cannot constitutionally prohibit them from accepting donations at places other than the designated solicitation booths. Section 9(c) of the ordinance provides that no person may "(r)eceive or accept any donation of money (but may direct to a location established under PART TWO of this Ordinance any person wishing to make such a donation)." The relevant portion of Part Two provides: " . . . (S) olicitations shall be conducted only from 'Solicitation Booths' which shall be furnished by the Commissioner; and such booths shall be located within the permissible areas at such points as may be designated from time to time by the Commissioner." § 16. As we said when we held this claim justiciable, p. 822 Supra, appellants attack this restriction on its face; they say that Atlanta has no power to impose this limitation on the places where donations may be accepted. They do not say, for example, that particular solicitation booths are located in such remote parts of the airport that members of the Society find it unreasonably difficult to perform their religious duty of soliciting donations.[15]
 
 
 34
 Atlanta attempts to justify this restriction as a regulation of the place and manner of religious expression. In general, a government may enact such a regulation so long as it does not classify expression on the basis of content, See e. g., Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951), and so long as the regulation is "reasonable," See, e. g., Prince v. Massachusetts, 321 U.S. 158, 166-70, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Cox v. New Hampshire, 312 U.S. 569, 574-77, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). See also Grayned v. City of Rockford, 408 U.S. 104, 115-16, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Appellants say both that the solicitation booths provisions classify on the basis of content and that they are not reasonable.
 
 
 35
 Appellants first assert, in effect, that the religious expression involved in accepting a donation differs in content from that involved in proselytizing, and that content-based classifications are unconstitutional under all but extraordinary circumstances. See, e. g., Hudgens v. NLRB, 424 U.S. 507, 520, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); Erznoznik v. City of Jacksonville, 422 U.S. 205, 209, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267.[16] Police Dep't v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), held that Chicago could not permit labor picketing near its schools but prohibit demonstrations on behalf of other causes; similarly, appellants say, Atlanta cannot permit what appellants depict as less controversial forms of religious activity generally throughout the airport while it circumscribes the religious act of accepting a donation.
 
 
 36
 We do not quarrel with the principle that, in general, a government may not discriminate against expression with a certain content. Our difficulty is with appellants' premise that accepting donations differs from proselytizing, distributing literature, and other forms of religious activity in content, not manner or form. This premise finds its best support in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Buckley dealt with the constitutionality of various congressional restrictions on contributions to political campaigns and expenditures made in connection with campaigns. The Buckley Court did not explicitly treat these restrictions as if they were regulations based on the content of expression, but it did require a more substantial justification of these restrictions than it would have required of such content-neutral regulations of the manner of speech as, for example, ordinances limiting the use of sound trucks. Id. at 18 & n. 17, 96 S.Ct. 612. On the basis of this holding, appellants argue that restrictions on giving and receiving contributions to a religion also cannot be treated as regulations of the manner or place of expression.
 
 
 37
 This argument fails. The Buckley Court emphasized that when Congress enacted the campaign expenditure and contribution limits, it intended to reduce the influence of those who spent money on politics. See id. at 17-18, 96 S.Ct. 612.
 
 
 38
 The interests served by the Act include restricting the voices of people and interest groups who have money to spend . . . . Although the Act does not focus on the ideas expressed . . . it is aimed in part at equalizing the relative ability of all voters to affect electoral outcomes . . . .
 
 
 39
 Id. at 17, 96 S.Ct. at 634. In other words, the Buckley regulations were directed at the communicative aspect of transferring money. In some measure, Congress wanted to interdict the messages that the transfers would convey. As the Court said, "it is beyond dispute that (Congress's) interest in regulating the . . . giving or spending (of) money 'arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful.' " Id. at 17, 96 S.Ct. at 634, Quoting United States v. O'Brien, 391 U.S. 367, 382, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).[17]
 
 
 40
 By contrast, Atlanta attempts to justify the solicitation booths provisions by referring only to the mechanical, non-communicative aspects of transferring money. In support of the provisions requiring solicitation booths, Atlanta submitted an affidavit from an airport manager which spoke of traffic congestion caused by "the fumbling through pocketbooks and wallets, the searching for the right amount of money, the making of change, and the dropping of money." R. at 236. In Buckley, the political significance of the transfers of money the likelihood that the contributor would attempt to influence the recipient, or that the spender would influence votes was the principal reason for the regulations; here, the religious significance of the contributions is irrelevant to Atlanta. If Atlanta had established the solicitation booths because soliciting funds was a controversial variety of religious expression particularly likely to snarl traffic in the terminal building by causing disputes, we would have a different case, one far closer to Buckley. But Atlanta has made no such claim. In this case, unlike Buckley, the regulated transfers of money were the medium, not the message.[18] For this reason, we must view Atlanta's solicitation booths provisions as regulations of the place and manner of religious expression that do not classify on the basis of content.
 
 
 41
 Accordingly, we need only decide whether the solicitation booths provisions are "reasonable". See, e. g., Grayned v. City of Rockford, 408 U.S. 104, 115-16, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Cox v. New Hampshire,312 U.S. 569, 574-77, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). Deciding what is reasonable is essentially a matter of balancing Atlanta's interest against appellants', See e. g., Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct.Rev. 1, 27-28, but the balancing is not unstructured. The governmental interest must be "substantial," See e. g., United States v. O'Brien, 391 U.S. 367, 376-77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), or "compelling", See e. g., Grayned v. City of Rockford, 408 U.S. 104, 119, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). We must decide "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time," Id. at 116, 92 S.Ct. at 2303, but in doing so we have to "weigh heavily the fact that communication is involved," Id. Moreover, we must insist that the regulation be narrowly tailored to serve the interest that assertedly justifies it. See, e. g.,id. at 116-17, 92 S.Ct. 2294; Cox v. Louisiana (II), 379 U.S. 559, 562-64, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); Schneider v. State, 308 U.S. 147, 164, 60 S.Ct. 146, 84 L.Ed. 155 (1939); Lovell v. City of Griffin, 303 U.S. 444, 451, 58 S.Ct. 666, 82 L.Ed. 949 (1938). But in this case appellants were asking for a preliminary injunction; that makes it more difficult for them to obtain relief against the solicitation booths provisions. See, e. g., Compact Van Equipment Co. v. Leggett & Platt, Inc., 566 F.2d 952, 954 (5th Cir. 1978).
 
 
 42
 We do not think that the district judge abused his discretion when he denied the preliminary injunction. Under the terms of the ordinance, appellants can ask for funds or attempt to sell religious tracts at any place in the airport where they are allowed to proselytize; the ordinance requires only that instead of accepting any proffered money, they refer the donor to a solicitation booth. We do not doubt that this is burdensome and that appellants lose money as a result. But there is little in this record to reveal the extent of the loss, and it is not obvious that the loss would be very great. Atlanta's interest in confining transfers of money to the booths is better documented. The airport's Operations Manager asserted in an affidavit, and appellants do not deny, that Atlanta's is an unusually congested airport and that since about two-thirds of the passengers boarding planes in Atlanta are transferring from other flights, it is important that they be able to move easily through the terminal. The Operations Manager also said:
 
 
 43
 "The activities of the various organizations conducting their activities in the Terminal Building and especially those of the Krishna Society where they relate to money, have created confusion and caused congestion by the stopping of people in their normal movement through the building, the fumbling through pocketbooks and wallets, the searching for the right amount of money, the making of change, and the dropping of money. Deponent has observed such congestion and confusion on numerous occasions as he has watched the activities of these organizations. It is for these reasons that the City has required that donations of money be received only at solicitation booths located at points which will avoid such problems."
 
 
 44
 On its face, this affidavit shows Atlanta's "substantial" interest in limiting the exchange of money to solicitation booths, and it tends to show that exchanging money would be "incompatible with the normal activity of" the airport if it were not confined to the solicitation booths. Since appellants neither contested the truth of the affidavit nor offered contradictory evidence, the affidavit's assertions are sufficient to sustain the solicitation booths provisions. Needless to say, appellants are free, in any further proceedings concerning permanent relief, to attempt to show that Atlanta has overestimated the congestion caused by exchanging money. They might present evidence contradicting the Operations Manager's affidavit, for example, or they might show that other airport regulations for example, those permitting commercial sales belie the city's claims about the disruptive effects of transferring money.[19]
 
 
 45
 Finally, appellants claim that these provisions are not "narrowly tailored to further the (city's) legitimate interest." Grayned v. City of Rockford, 408 U.S. 104, 116-17, 92 S.Ct. 2294, 2303-2304, 33 L.Ed.2d 222 (1972); See Davis v. Francois, 395 F.2d 730 (5th Cir. 1968). The ordinance, they point out, does not prohibit digging into pockets and fumbling for money, the assertedly disruptive acts; it does not prohibit the requests for donations which are likely to precipitate such disruptive acts; and it does not prohibit tendering a donation, the purpose of the disruptive acts. All the solicitation booths provisions prohibit is accepting a donation, and that, appellants say, is precisely the least disruptive act in the chain. At best, then, appellants argue, the solicitation booths provisions are not "narrowly tailored"; at worst they are simply arbitrary.
 
 
 46
 This argument rests on a misconception. To say that a regulation must be tailored to the ends it serves is not to say that it can serve only one end. A regulation of the place or manner of religious exercise is constitutional if it makes a substantial enough contribution to some Combination of important governmental ends to outweigh its restrictive effect on first amendment freedoms. In the first amendment area we will not strain our imaginations to link a measure with objectives which the government will not avow, or which the measure promotes only very indirectly, but here Atlanta's aims are obvious. It wished to reduce disruption, and, as we have just discussed, the solicitation booths provisions are one of the several possible ways to do that. But obviously Atlanta also wanted to adopt an ordinance that was fair and enforceable. It is manifestly more fair to place a duty on permit holders, who can be put on notice, than on travellers who happen to be using Atlanta's airport; similarly, a regulation that prohibited permit holders from asking for donations,[20] or travellers from offering them, would be far more difficult to enforce than one which prohibited only the discrete and (relatively) easily defined act of accepting them. Thus the solicitation booths provisions make a very substantial contribution to the pursuit of an important goal consisting of three specific ends fairness, ease of enforcement, and reduced disruption. Considered as such, on this record, its benefits outweigh the burdens it places on religious practices. It is therefore constitutional.
 
 B.
 Section 9(a) of the ordinance provides:
 
 47
 "(N)o person shall . . . (i)n anywise obstruct, delay, or interfere with the free movements of any other person, seek to coerce or physically disturb any other person, or hamper or impede the conduct of any authorized business at the Airport."
 
 
 48
 Appellants focus on the terms "obstruct," "delay," "interfere," "coerce," "disturb," "hamper," and "impede." They assert that these terms are vague and overbroad. The vagueness and overbreadth challenges are linked, as these two notions often are. Appellants' claim is that if these terms are assigned the only plain meaning they can possibly have, they outlaw a variety of constitutionally protected activities and are therefore overbroad. See, e. g., Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Hobbs v. Thompson, 448 F.2d 456, 459-60 (5th Cir. 1971). If they are not assigned this meaning, appellants suggest, they have no precise meaning and are unconstitutionally vague. See, e. g., Hynes v. Mayor of Oradell, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976). Obviously, both of appellants' challenges fail if these terms have a precise meaning that does not reach protected conduct. The district court held that they have such a meaning. We agree that some of these terms do, but believe that others have no ascertainable meaning at all.[21]
 
 
 49
 Any law is unconstitutionally vague if people "of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Measures affecting first amendment rights must be drafted with an even "greater degree of specificity." E. g., Smith v. Goguen, 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).[22] " Condemned to the use of words," however, "we can never expect mathematical certainty from our language." Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972). See also American Communications Association v. Douds, 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950). ("There is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be a nice question. The (objective), however, is not . . . (the) wholly consistent academic definition of abstract terms.") We must also bear in mind that "(t)he applicable standard . . . is . . . the practical criterion of fair notice to those to whom the statute is directed. The particular context is all important." Id. Because this ordinance deals only with the airport, and only with those licensed to proselytize there, it will be applied repeatedly by a relatively small number of enforcement officials to a relatively small number of people. Over time indeed, probably fairly quickly certain patterns of enforcement and tacit understandings will develop. This "less formalized custom and usage," Parker v. Levy, 417 U.S. 733, 754, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), will clarify much of the inevitable imprecision. Supreme Court decisions strongly suggest that the authorities will not be permitted to prosecute conduct permitted by those understandings, See e. g., id.; Cox v. Louisiana (II), 379 U.S. 559, 568-73, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); Raley v. Ohio, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), even if it is apparently proscribed by the ordinance itself. "Deeply embedded traditional ways of carrying out state policy . . . are often tougher and truer law than the dead words of the written text." Nashville, C. & St. L. Ry. v. Browning, 310 U.S. 362, 369, 60 S.Ct. 968, 972, 84 L.Ed. 1254 (1940). Under these circumstances, we can permit slightly more imprecision than we would approve in a measure about to be enforced against the public at large in multifarious contexts.
 
 
 50
 In light of these principles, the phrase "seek to coerce or physically disturb any other person" in § 9(a) poses little problem. "Coerce" is used throughout the law; one does not coerce unless one threatens some serious harm or applies force, and appellants, of course, do not claim the right to do that. "Physically disturb" obviously involves some harmful or offensive contact, actual or apparently imminent. If the ordinance simply outlawed " physical disturbances," one might be uncertain whether the term comprised both accidental and negligent disturbances. But under § 9(a) permit holders may not "seek to . . . physically disturb." One who does something accidentally or carelessly has, by definition, not sought to do it. So the "coerce or physically disturb" clause of § 9(a) is sufficiently precise.
 
 
 51
 The phrase "in anywise obstruct, delay or interfere with the free movement of any other person" is more problematic, but here precedent confines us. In Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), the Supreme Court upheld, against a facial vagueness claim, a statute prohibiting "picketing * * * in such a manner as to obstruct or unreasonably interfere with free ingress or egress to or from any * * * county * * * courthouses * * *." The Court said that "obstruct" and "unreasonably interfere" were "plainly" not vague. Id. at 616, 88 S.Ct. at 1338. Arguably, obstructing and interfering with "free ingress or egress to and from" a building are more clearly defined acts than generally obstructing or interfering with "free movements." Entrances and exits are usually obvious and traffic moves through them in regular and predictable ways; "free movements" may, in some contexts, include such a variety of random and unexpected actions that persons subject to the restriction cannot know what they are to avoid doing. But as we have noted, this ordinance applies only to airports. In an airport unlike a park, for example "free movements" are likely to be almost as regular and predictable as those of people entering and leaving a building.
 
 
 52
 Appellants also complain that this portion of § 9(a) might make illegal the routine distraction and diversion inevitably caused by activities like theirs. The purpose of the ordinance, however, is to authorize these activities under certain circumstances, and it would be most eccentric to read this section as nullifying the rest of the ordinance.[23] Appellants also say that it is unclear whether § 9(a) reaches negligent or inadvertent interfering, obstructing, or delaying; we believe, however, as the Cameron Court apparently did, that the words themselves imply intentional action. This portion of § 9(a) is also not unconstitutional on its face.
 
 
 53
 The remaining clause of § 9(a) provides that "no person shall . . . hamper or impede the conduct of any authorized business at the airport." This part of § 9(a) is unconstitutionally vague. We must assume that it is intended to proscribe actions not already reached by the other language of § 9(a), and it is not clear what those actions are. One may, of course, "hamper or impede the conduct of" a business at an airport by interrupting a person while he or she is attempting to buy a ticket or a newspaper; a provision specifically prohibiting that sort of conduct would not be vague. But distracting a person who is on his or her way to transact some other business may also be thought to "hamper or impede the conduct" of the business. More generally, leafletting or soliciting on a route used by those who are about to patronize a business may divert some from continuing and discourage others. Indeed, the very proximity of a proselytizer for an unpopular cause may and no doubt generally does adversely affect many businesses; these adverse effects might be comprised by the terms "hamper or impede the conduct of (a) business." Thus in Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), the Supreme Court invalidated an Alabama statute which prohibited picketing "for the purpose of hindering, delaying, or interfering with or injuring any lawful business", because, it said, that offense "can be proved merely by showing that others reacted in a way normally expectable of some upon learning the facts of a dispute," Id. at 100, 60 S.Ct. at 743.[24] This part of § 9(a) is too inscrutable; these several constructions are all plausible, and people in appellants' position cannot know which to expect. It is void for vagueness.
 
 C.
 
 54
 The penalty provision of Atlanta's ordinance, § 18, automatically revokes the permit of any person "(c)onvict(ed) of a violation of a provision of this Ordinance." § 18(a).[25] Moreover, in the event that three (3) or more convictions hereunder of a person or persons representing the same organization occur within a period of six (6) months, then the third conviction shall serve to automatically terminate any permit which may have been issued to the organization which such person or persons represent.
 
 
 55
 § 18(b). Individuals and organizations who lose their permits in this fashion cannot reapply for twelve months. § 18(c).[26]
 
 
 56
 This section presents no difficult issues; it is simply a recipe for an unlawful prior restraint. A plausible but broad generalization can support some kinds of regulation, See, e. g., New York City Transit Authority v. Beazer, --- U.S. ----, ----, 99 S.Ct. 1355, 1368-69, 59 L.Ed.2d 587 (1979), but no government may impose a prior restraint unless it has shown, at the very least, that the particular speech it is attempting to suppress is overwhelmingly likely to fall outside the protection of the first amendment.[27] A person may not be prevented from speaking unless what he or she will say or the time, place, and manner in which he or she will say it will "surely result in direct, immediate, and irreparable damage." New York Times Co. v. United States, 403 U.S. 713, 730, 91 S.Ct. 2140, 2149, 29 L.Ed.2d 822 (1971) (Stewart, J., joined by White, J., concurring). See also Nebraska Press Association v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). Atlanta attempts to meet this extraordinary burden by asserting, in the case of restrictions on individuals, that once a sinner always a sinner; anyone who has violated the ordinance once is likely to violate it again. We have recently held, en banc, that no prior restraint may be based on this broad generalization. Universal Amusement Co. v. Vance, 587 F.2d 159, 165-66 (5th Cir. 1978). The § 18 restriction on organizations merely conjoins this premise with one of guilt by association; sinners, apparently, flock together.[28] This generalization is, at best, equally weak. It cannot support a prior restraint either. The penalty provision is unconstitutional.
 
 IV.
 
 57
 Appellants' challenge to the provisions governing the issuing of permits by the Commissioner of Aviation has become moot. Therefore the portion of the district court's order denying a preliminary injunction against these provisions is vacated, and the case is remanded with instructions to dismiss, without prejudice, this portion of the complaint. See Kremens v. Bartley, 431 U.S. 119, 129, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977); United States v. Munsingwear, Inc., 340 U.S. 36, 39, 71 S.Ct. 104, 95 L.Ed. 36 (1950).[29] The claims against §§ 8 and 16 of the ordinance are not justiciable; the portion of the district court's order denying a preliminary injunction against these provisions is therefore also vacated, and the case is remanded with instructions to dismiss, without prejudice, these parts of the complaint as well. The district court's denial of a preliminary injunction against the provisions concerning solicitation booths is affirmed. The denial of a preliminary injunction against the enforcement of § 9(a) is affirmed except insofar as the district court refused to enjoin prosecutions under the phrase "hamper or impede the conduct of any authorized business at the airport"; to that extent the district court's order is reversed and remanded for proceedings consistent with this opinion. The district court's denial of a preliminary injunction against § 18 of the ordinance is reversed and remanded for proceedings consistent with this opinion.
 
 
 58
 AFFIRMED IN PART; VACATED & REMANDED IN PART; AND REVERSED & REMANDED IN PART.
 
 APPENDIX I
 
 59
 The Atlanta Airport ordinance in effect at the time of the district court's decision:
 
 PART ONE
 
 60
 Section 1. Any person or organization desiring to engage in activities at any airport owned by the City of Atlanta ("Airport") which involve the exercise of constitutional freedoms, including but not limited to distribution of non-commercial, non-obscene, non-subversive literature, shall be protected in such activities, provided that the same do not constitute commercial activities and do not result in interference with the transportation function of the Airport.
 
 
 61
 Section 2. The regulations hereinafter set out are hereby declared to be necessary for the accomplishment of the following purposes:
 
 
 62
 (a) To insure that persons seeking to exercise constitutional freedoms of expression can communicate effectively with users of the Airport;
 
 
 63
 (b) To insure adequate nearby police facilities for the protection of persons exercising their constitutional freedoms;
 
 
 64
 (c) To restrict such activities to public areas of Airport buildings and premises;
 
 
 65
 (d) To protect persons using the Airport from repeated communications or encounters which might constitute harassment or intimidation; and
 
 
 66
 (e) To insure the free and orderly flow of pedestrian traffic through the Airport premises.
 
 
 67
 Section 3. Any person or organization desiring to distribute literature at the Airport shall first obtain a written permit therefor from the Commissioner of Aviation ("Commissioner"). For purposes of obtaining such permit, there shall be submitted to the Commissioner a written application setting forth the following:
 
 
 68
 (a) The full name, mailing address and telephone number of the person or organization sponsoring, promoting or conducting the proposed activities;
 
 
 69
 (b) The full name, mailing address and telephone number of the individual person or persons who will have supervision of and responsibility for the proposed activities;
 
 
 70
 (c) The subject matter of the proposed distribution or communication, and the purpose thereof;
 
 
 71
 (d) A description of the proposed activities, indicating the type of communication to be involved;
 
 
 72
 (e) The dates and hours on and during which the activities are proposed to be carried out, and the expected duration of the proposed activities; and
 
 
 73
 (f) The number of persons to be engaged in said activities at the Airport.
 
 
 74
 Section 4. The permit shall be issued within five days following receipt of the application by the Commissioner or the applicant shall, within said five day period, be furnished a written statement indicating the reasons why the permit will be denied; provided, that in no event shall the Commissioner issue a permit for a period of time in excess of ninety (90) days. In the event that any permit hereunder is denied, by reason of unusual or emergency conditions at the Airport, or for other valid reason, the City of Atlanta, acting by and through its City Attorney (or his designee) shall within five (5) days following such denial, apply to either the United States District Court for the Northern District of Georgia, or to the Superior Court of Fulton County, Georgia, for a judicial determination as to whether the proposed activities described in the application may be prohibited, naming the applicant as a party defendant. The City shall exert every reasonable effort to have this issue heard on its merits without delay, and as soon as legally possible. The burden of showing that the proposed activities may be prohibited shall rest on the City. In the event that the applicant certifies in his application for a permit that, due to emergency circumstances, the permit applied for is required by a specified time in order to be effective, then upon receipt of such certification, the Commissioner shall issue a permit within the time requested in the application.
 
 
 75
 Section 4A. If the issue for judicial determination described in Section 4 above is not heard and decided on the merits by the court within ten (10) days from the date the complaint is filed, then an interim permit shall be deemed issued under this ordinance to the applicant by operation of law, and all activities proposed to be carried on in the application for the original permit may be carried on just as though a permit had been duly issued by the Commissioner, subject to the same restrictions and obligations under this ordinance as other permitted activities.
 
 
 76
 The interim permit shall be deemed renewed each ninety (90) day period for so long as no judicial determination has been made and from the time such determination is made until the time for appeal therefrom has expired. Should either party appeal from the judicial determination, an interim permit shall be deemed issued under this ordinance to the applicant by operation of law as of the date the notice of appeal is filed, and all activities proposed to be carried on in the application for the original permit may be carried on just as though the permit had been duly issued by the Commissioner, subject to the same restrictions and obligations under the ordinance as other permitted activities. The interim permit shall be deemed renewed each ninety (90) day period and shall continue in effect as provided hereinabove until a final and binding appellate decision has been reached. If the City appeals an adverse judicial determination, it shall file its notice of appeal within five (5) days following said determination.
 
 
 77
 Section 5. The activities referred to herein shall be conducted strictly in conformity with the terms and conditions of this Ordinance and the permit issued by the Commissioner.
 
 
 78
 Section 6. The activities referred to herein shall be conducted only in or upon those premises which are non-secured, public use areas. Further, under no circumstances shall the same be conducted:
 
 
 79
 (a) Beyond the security check points through which passengers and visitors are required to pass when moving toward aircraft gate positions; i. e., on the side of the security check points where the gate positions of arriving and departing aircraft are located;
 
 
 80
 (b) In any areas reserved for particular uses, such as parking areas, restroom facilities, restaurants, ticket counters or baggage claim areas;
 
 
 81
 (c) Within ten (10) feet of any area leased exclusively to a tenant of the Airport; or
 
 
 82
 (d) Within thirty (30) feet of any security check point.
 
 
 83
 Section 7. The term "area" as used in Section 8 hereof, with respect to Hartsfield Atlanta International Airport, shall mean any one of those areas which are numbered 1 through 5 and circumscribed in red on the floor plan of said Airport which appears on the two (2) pages attached hereto, marked Exhibit A, and fully incorporated herein by reference.
 
 
 84
 Section 8. In each permit issued by him the Commissioner shall specify, in accordance with the provisions of this Ordinance, the area or areas in which the proposed activities by the applicant may be conducted. The Commissioner may move such permitted activities from one area to another and among the different areas upon reasonable written notice to the applicant when in the judgment of the Commissioner such move or moves are necessary to the efficient and effective operation of the transportation function of the Airport.
 
 
 85
 In the event that two or more persons or organizations seek to conduct the activities described herein at the same time, the Commissioner shall apportion the available areas between or among them all on as equitable a basis as possible.
 
 
 86
 In no event, however, shall more than three (3) persons be engaged in any activities and solicitations permitted by Part I and Part II of this Ordinance in any one area at the same time. When the Commissioner receives more applications for permits than he is able to grant by following this rule, then he may impose such reasonable and equitable restrictions as to allowable dates or hours or numbers of participants as may reasonably be required to provide fair and as equal as possible opportunities for all applicants, while insuring the efficient and effective operation of the transportation function of the Airport.
 
 
 87
 Section 9. In conducting the activities described herein, no person shall:
 
 
 88
 (a) In any wise obstruct, delay or interfere with the free movements of any other person, seek to coerce or physically disturb any other person, or hamper or impede the conduct of any authorized business at the Airport;
 
 
 89
 (b) Use any sound or voice amplifying apparatus on the premises of the Airport; or
 
 
 90
 (c) Receive or accept any donation of money (but may direct to a location established under PART TWO of this Ordinance any person wishing to make such a donation).
 
 PART TWO
 
 91
 Section 10. The regulations hereinafter set out are hereby declared to be necessary for the accomplishment of the following purposes:
 
 
 92
 (a) To insure that only non-profit, charitable or religious organizations are permitted to solicit funds on the Airport premises;
 
 
 93
 (b) To insure that properly authorized persons and organizations seeking to solicit funds have adequate exposure to the traveling public;
 
 
 94
 (c) To restrict such solicitation of funds to public areas of Airport buildings and premises;
 
 
 95
 (d) To protect persons using the Airport from repeated communications or encounters which might constitute harassment or intimidation; and
 
 
 96
 (e) To insure the free and orderly flow of pedestrian traffic through the Airport premises.
 
 
 97
 Section 11. Any person or organization desiring to solicit funds at the Airport shall first obtain a written permit therefor from the Commissioner. For purposes of obtaining such permit, there shall be submitted to the Commissioner a written application setting forth the following:
 
 
 98
 (a) The full name, mailing address and telephone number of the person or organization sponsoring, promoting or conducting the solicitation;
 
 
 99
 (b) The full name, mailing address and telephone number of the individual person or persons who will have supervision of and responsibility for the proposed solicitation;
 
 
 100
 (c) The purpose of the proposed solicitation;
 
 
 101
 (d) The dates and hours on and during which the solicitation is proposed to be carried out, and the expected duration of the proposed solicitation; and
 
 
 102
 (e) The number of persons proposed to be engaged in such solicitation.
 
 
 103
 Section 12. The permit shall be issued within five (5) days following receipt of the application by the Commissioner or the applicant shall, within said five (5) day period, be furnished a written statement indicating the reasons why the permit will be denied. In the event that any permit hereunder is denied, the City of Atlanta, acting by and through its City Attorney (or his designee) shall within five (5) days following such denial, apply to either the United States District Court for the Northern District of Georgia, or to the Superior Court of Fulton County, Georgia, for a judicial determination as to whether the proposed solicitation described in the application may be prohibited, naming the applicant as a party defendant. The City shall exert every reasonable effort to have this issue heard on its merits without delay, and as soon as legally possible. The burden of showing that the proposed solicitation may be prohibited shall rest on the City.
 
 
 104
 Section 12A. If the issue for judicial determination described in Section 12 above is not heard and decided on the merits by the court within ten (10) days from the date the complaint is filed, then an interim permit shall be deemed issued under this Ordinance to the applicant by operation of law, and all activities proposed to be carried on in the application for the original permit may be carried on just as though a permit had been duly issued by the Commissioner, subject to the same restrictions and obligations under this Ordinance as other permitted activities.
 
 
 105
 The interim permit shall be deemed renewed each ninety (90) day period for so long as no judicial determination has been made and from the time such determination is made until the time for appeal therefrom has expired. Should either party appeal from the judicial determination, an interim permit shall be deemed issued under this Ordinance to the applicant by operation of law as of the date the notice of appeal is filed, and all activities proposed to be carried on in the application for the original permit may be carried on just as though the permit had been duly issued by the Commissioner, subject to the same restrictions and obligations under the Ordinance as other permitted activities. The interim permit shall be deemed renewed each ninety (90) day period and shall continue in effect as provided hereinabove until a final and binding appellate decision has been reached. If the City appeals an adverse judicial determination, it shall file its notice of appeal within five (5) days following said determination.
 
 
 106
 Section 13. The solicitations referred to herein shall be conducted strictly in conformity with the terms and conditions of this ordinance and the permit issued by the Commissioner.
 
 
 107
 Section 14. The solicitations referred to herein shall be conducted only in or upon those premises which are non-secured, public use areas. Further, under no circumstances shall the same be conducted:
 
 
 108
 (a) Beyond the security check points through which passengers and visitors are required to pass when moving toward aircraft gate positions; i. e., on the side of the security check points where the gate positions of arriving and departing aircraft are located;
 
 
 109
 (b) In any areas reserved for particular uses, such as parking areas, restroom facilities, restaurants, ticket counters or baggage claim areas;
 
 
 110
 (c) Within ten (10) feet of any area leased exclusively to a tenant of the Airport; or
 
 
 111
 (d) Within thirty (30) feet of any security check point.
 
 
 112
 Section 15. The term "area" as used in Section 16 hereof, with respect to Hartsfield Atlanta International Airport, shall mean any one of those areas which are numbered 1 through 5 and circumscribed in red on the floor plan of said Airport which appears on the two (2) pages attached hereto, marked Exhibit A, and fully incorporated herein by reference.
 
 
 113
 Section 16. In each permit issued by him the Commissioner shall specify, in accordance with the provisions of this Ordinance, the area or areas in which the proposed solicitations by the applicant may be conducted. Such solicitations shall be conducted only from "Solicitation Booths" which shall be furnished by the Commissioner; and such booths shall be located within the permissible areas at such points as may be designated from time to time by the Commissioner.
 
 
 114
 In the event that two (2) or more persons or organizations seek to conduct the solicitations described herein at the same time, the Commissioner shall apportion the available areas between or among them all on as equitable a basis as possible.
 
 
 115
 In no event, however, shall more than three (3) persons be engaged in any activities and solicitations permitted by Part I and Part II of this Ordinance in any one area at the same time. When the Commissioner receives more applications for permits than he is able to grant by following this rule, then he may impose such reasonable and equitable restrictions as to allowable dates or hours or numbers of participants as may reasonably be required to provide fair and as equal as possible opportunities for all applicants, while insuring the efficient and effective operation of the transportation function of the Airport.
 
 
 116
 Section 17. In the solicitation of funds, no sound or voice amplifying apparatus shall be used; and no signs or printed matter shall be attached to the "Solicitation Booths," except such as may be necessary to identify the organization which is conducting a solicitation.
 
 PART THREE
 
 117
 Section 18. Any violation of a provision of this Ordinance shall constitute an offense for the purposes of Section 1-9 of this Code.
 
 
 118
 (a) Conviction of a violation of a provision of this Ordinance in the Municipal Court of Atlanta shall automatically terminate any permit hereunder which the convicted person may hold, and shall terminate the authority of such person to conduct activities and solicitations pursuant to any permit held by an organization which he represents.
 
 
 119
 (b) In the event that three (3) or more convictions hereunder of a person or persons representing the same organization occur within a period of six (6) months, then the third conviction shall serve to automatically terminate any permit which may have been issued to the organization which such person or persons represent.
 
 
 120
 (c) Whenever an organization's permit is terminated under this Section, the organization which held such permit shall thereafter be ineligible to receive any permit under this Ordinance for a period of twelve (12) months following the time when the judicial determination provided for herein has become final and binding. A person convicted of a violation of this Ordinance shall be ineligible to receive a permit hereunder for a period of twelve (12) months following the time when the judicial determination provided for herein has become final and binding.
 
 
 121
 (d) In the event that any permit is terminated under this Section, the City of Atlanta, acting by and through its City Attorney (or his designee) shall within five (5) days following such termination, apply to either the United States District Court for the Northern District of Georgia, or to the Superior Court of Fulton County, Georgia, for a judicial determination as to whether the permit has been lawfully revoked, naming the applicant for said permit as a party defendant. The City shall exert every reasonable effort to have this issue heard to its merits without delay, and as soon as legally possible. The burden of showing that the permit has been lawfully revoked shall rest on the City.
 
 
 122
 (e) If the issue for judicial determination described in subsection (d) above is not heard and decided on the merits by the court within ten (10) days from the date the complaint is filed, then an interim permit shall be deemed issued under this Ordinance to the applicant by operation of law, and all activities proposed to be carried on in the application for the original permit may be carried on just as though a permit had been duly issued by the Commissioner, subject to the same restrictions and obligations under this Ordinance as other permitted activities.
 
 
 123
 The interim permit shall be deemed renewed each ninety (90) day period for so long as no judicial determination has been made and from the time such determination is made until the time for appeal therefrom has expired. Should either party appeal from the judicial determination, an interim permit shall be deemed issued under this Ordinance to the applicant by operation of law as of the date the notice of appeal is filed, and all activities proposed to be carried on in the application for the original permit may be carried on just as though the permit had been duly issued by the Commissioner, subject to the same restrictions and obligations under the Ordinance as other permitted activities. The interim permit shall be deemed renewed each ninety (90) day period and shall continue in effect as provided hereinabove until a final and binding appellate decision has been reached. If the City appeals an adverse judicial determination, it shall file its notice of appeal within five (5) days following said determination.
 
 PART FOUR
 
 124
 Section 19. All Ordinances and parts of Ordinances in conflict herewith are hereby repealed.
 
 APPENDIX II
 
 125
 The portions of the ordinance that have been amended since the district court's decision, as amended:
 
 
 126
 "Section (1): Any person or organization desiring to distribute literature or solicit funds at any airport owned by the city ("airport") in the exercise of constitutional freedoms, shall be protected in such activities in accordance with the regulations hereinafter provided."
 
 
 127
 "Section (4): Upon receipt of an application containing information as described in Section (3) the commissioner shall forthwith issue a permit to the applicant, if there is space available in the airport terminal, applying only the limitations and regulations set forth in this ordinance. The commissioner shall exercise no judgment regarding the purpose or content of the proposed activity and shall exercise no discretion over the issuance of a permit hereunder, except as provided in this ordinance, it being the intent of this ordinance that the issuance of a permit by the commissioner under this section shall be a routine clerical and mandatory function. Provided, that in no event shall the commissioner issue a permit for a period of time in excess of 30 days. In the event that any permit hereunder is denied, the city, acting by and through its city attorney (or his designee) shall within five (5) days following such denial, apply to either the United States District Court for the Northern District of Georgia, or to the Superior Court of Fulton County, Georgia, for a judicial determination as to whether the proposed activities described in the application may be prohibited, naming the applicant as a party defendant. The city shall exert every reasonable effort to have this issue heard on its merits without delay, and as soon as legally possible. The burden of showing that the proposed activities may be prohibited shall rest on the city. In the event that the applicant certifies in his application for a permit that, due to emergency circumstances, the permit applied for is required by a specified time in order to be effective, then upon receipt of such certification, the commissioner shall issue a permit within the time requested in the application."
 
 
 128
 "(Section 6(a)): Beyond the security checkpoints through which passengers and visitors are required to pass when moving toward aircraft gate positions; i. e., on the side of the security checkpoints where the gate positions of arriving and departing aircraft are located; except as hereinafter provided in Division 3;"
 
 
 129
 "(Section 9):
 
 
 130
 (d) Use any noise making devices; or
 
 
 131
 (e) In any way indicate to the public that he is a representative of the City of Atlanta, or the Atlanta airport authorities.
 
 
 132
 (f) Misrepresent his or her identity."
 
 
 133
 "Section (12): Upon receipt of an application containing information as described in Section (11), the commissioner shall forthwith issue a permit to the applicant, if there is space available in the airport terminal, applying only the limitations and regulations set forth in this ordinance. The commissioner shall exercise no judgment regarding the purpose or content of the proposed activity and shall exercise no discretion over the issuance of a permit hereunder, except as provided in this ordinance, it being the intent of this ordinance that the issuance of a permit by the commissioner under this section shall be a routine clerical and mandatory function. Provided, that in no event shall the commissioner issue a permit for a period of time in excess of 30 days. In the event that any permit hereunder is denied, the city, acting by and through its city attorney (or his designee) shall within five (5) days following such denial, apply to either the United States District Court for the Northern District of Georgia, or to the Superior Court of Fulton County, Georgia, for a judicial determination as to whether the proposed activities described in the application may be prohibited, naming the applicant as a party defendant. The city shall exert every reasonable effort to have this issue heard on its merits without delay, and as soon as legally possible. The burden of showing that the proposed activities may be prohibited shall rest on the city."
 
 
 134
 "(Section 14(a)): Beyond the security checkpoints through which passengers and visitors are required to pass when moving toward aircraft gate positions; i. e., on the side of the security checkpoints where the gate positions of arriving and departing aircraft are located; except as hereinafter provided in . . . ."
 
 
 135
 "(Section 17): In the solicitation of funds, no sound or voice amplifying apparatus or noise making devices shall be used; and no signs or printed matter shall be attached to the "solicitation booths," except such as may be necessary to identify the organization which is conducting a solicitation. No person or organization soliciting funds shall in any way indicate to the public that he is a representative of the City of Atlanta or the Atlanta airport authorities."
 
 
 136
 Sections 3(c) and 11(c) of the original ordinance were deleted.
 
 
 
 [1]
 The district court granted appellants' motion for a preliminary injunction against an earlier version of the airport ordinance. In response, Atlanta amended the ordinance. Appellants then amended their complaint to challenge the rewritten ordinance and moved for a preliminary injunction. They appeal from the denial of this motion
 
 
 [2]
 The ordinance that was upheld by the district court, and amendments enacted since the district court's decision, are appended to this opinion
 
 
 [3]
 The amendments excised the portions of §§ 1 and 4 to which appellants objected. Appellants also argued that language in § 10 gave the Commissioner excessively broad discretion; this language has not been removed but its effect, if any, was radically altered by the amendments to §§ 11 and 12. Our instruction to the district court is to dismiss this portion of the complaint without prejudice, so appellants are free to challenge § 10 again; obviously they can challenge any part of the amendments as well
 
 
 [4]
 Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), may be the origin of the rule that a plaintiff must show a threat of enforcement. Young permitted a suit against a state official to enjoin an unconstitutional action. It circumvented the eleventh amendment by reasoning that the suit was against the official as an individual tortfeasor who lost his official immunity when he violated the Constitution. It follows from this reasoning that a plaintiff may sue only the particular official who has threatened to take some unconstitutional action against him or her. See generally Comment, Threat of Enforcement Prerequisite of a Justiciable Controversy, 62 Colum.L.Rev. 106, 111-13 (1962). The Young rationale is, of course, now recognized as a fiction
 
 
 [5]
 See generally A. Bickel, The Least Dangerous Branch, 146-48, 155-56 (1962)
 
 
 [6]
 The probability of enforcement seems relevant to these concerns in only one way. If there is no serious possibility that a statute will be enforced against him, a plaintiff with a genuine independent interest in acting in the way it proscribes will probably do so. A plaintiff who does not act but instead challenges its constitutionality is, therefore, more likely to be raising the constitutional claim simply because he wants to enforce his constitutional rights, not for reasons connected to any genuine concrete dispute. The premise of Marbury v. Madison, of course, does not permit a constitutional claim to be raised in this fashion. But any probability of enforcement, however small, may deter even a genuinely interested plaintiff. And a conscientious citizen may be unwilling to break any law that has not been repealed or invalidated, even if he believes it to be unconstitutional
 
 
 [7]
 "(T)he present case was brought, the appeal of right is properly here, and it is our duty to decide the issues presented." 393 U.S. at 102, 89 S.Ct. at 269
 
 
 [8]
 See P. Bator et al., Hart & Wechsler's The Federal Courts and the Federal System (2d ed.) 657 (1973). Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 689 (1961), which seems irreconcilable with Epperson, in fact supports this conclusion. Poe was an anticipatory challenge to the constitutionality of a Connecticut statute punishing anyone who used contraceptives or gave medical advice about them. The Court refused to decide the case on the merits; the prevailing plurality opinion pointed to Connecticut's persistent refusal to enforce the statute. But the plurality opinion's language suggests that the decision was not jurisdictional but "discretionary." See id. at 502-09, 81 S.Ct. 1752. This view may be inconsistent with Epperson's apparent insistence that the Supreme Court decide all mandatory appeals of which it has jurisdiction, See also Rescue Army v. Municipal Court, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947), but it supports the Epperson Court's implicit holding that the probability of enforcement is irrelevant to the existence of an Article III case or controversy
 
 
 [9]
 Hynes v. Mayor of Oradell, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976) reinforces our conclusion that the district court had jurisdiction over these claims. In Hynes, the Supreme Court upheld, on the merits, an anticipatory challenge to two Oradell, New Jersey, municipal ordinances regulating door-to-door solicitation and canvassing. That challenge, like these appellants', asserted that the ordinances imposed unconstitutionally vague restrictions on persons engaged in activities protected by the first amendment. The Hynes plaintiffs asserted only that they wished to campaign or canvass door-to-door in Oradell, or that they wished to speak to door-to-door canvassers. They did not allege that the ordinances had been enforced against them in any way. The case reached the Supreme Court on appeal from the New Jersey Supreme Court, and the Court decided the case on the merits without discussing jurisdiction. A dissenting opinion remarked on the problematic procedural posture of the case, however, See id. at 633 n. *, 635, 96 S.Ct. 1755 (Rehnquist, J., dissenting), and of course the Court would have had to dismiss the appeal if it lacked jurisdiction. See Doremus v. Board of Educ., 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952). Thus the Court's decision on the merits indicates that the requirements of Article III were met. We should note, however, that the Hynes plaintiffs included persons who wished to speak to door-to-door canvassers; they, of course, could not test the ordinances' validity by violating it, so their claim to be heard in anticipatory proceedings was arguably stronger than the potential speakers', in Hynes, or appellants' here. See, e. g., Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)
 
 
 [10]
 It can be argued that the Court invalidates an excessively broad grant of discretion on its face because it is too difficult to review the merits of a highly particular decision made by a low-level official in accordance with no explicit standard. See Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 876-82 (1970). Cf. Alexander v. Louisiana, 405 U.S. 625, 630, 92 S.Ct. 1221, 31 L.Ed.2d 526 (1972) (use of questionable procedures in jury selection supports inference of racial discrimination). See generally The Supreme Court, 1976 Term, 91 Harv.L.Rev. 70, 172 (1977). But most of these difficulties occur in reviewing decisions made under more specific statutes as well, See, e. g., Poulos v. New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953), so this cannot be a complete explanation. Antipathy to the mere existence of censorial power must play some role
 
 
 [11]
 O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), is not inconsistent with this conclusion. The plaintiffs in O'Shea charged that local judges discriminated against blacks, and violated the Constitution in other ways, in setting bail, sentencing, and administering various other aspects of the criminal justice system. None of the plaintiffs alleged that he or she had actually been charged or was awaiting trial or sentencing before one of the defendants. Id. at 492, 94 S.Ct. 669. (The Court noted that Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), would preclude such a defendant from seeking relief in federal court in any event. 414 U.S. at 492, 91 S.Ct. 746. But see Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).) The Court said, "If the statutes that might possibly be enforced against (plaintiffs) are valid laws, . . . the question becomes whether any perceived threat to (plaintiffs) is sufficiently real and immediate to show an existing controversy simply because they anticipate violating lawful criminal statutes and being tried for their offenses, in which event they may appear before (defendants) and, if they do, will be affected by the allegedly illegal conduct charged." Id., 414 U.S. at 496-97, 94 S.Ct. at 676. Such a prediction was only "speculation and conjecture," the Court held, insufficient to establish a case or controversy. Id. at 497, 94 S.Ct. 669. "We assume that (plaintiffs) will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners." Id
 The decisive difference between O'Shea and appellants' attack on § 18 is that the plaintiffs in O'Shea alleged only "the prospect of future injury," Id. at 496, 94 S.Ct. 669, a prospect "necessarily contingent" upon several intervening events, Id. at 498, 94 S.Ct. 669; they could identify no present injury to themselves, much less an injury to their first amendment interests. They did allege that they were engaged in political protests which raised racial tensions, but as the Court noted, Id. at 497, 94 S.Ct. 669 they did not link these activities to the alleged constitutional violations of which they complained. For example, they did not claim, as appellants can here, that the prospect of an assertedly unconstitutional punishment reduced the vigor with which they exercised their first amendment rights.
 
 
 [12]
 Appellees argue in effect that other provisions of § 18 obviously designed to comply with the procedural requirements of Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and kindred cases should induce us to hold any anticipatory challenge to § 18 nonjusticiable. Section 18(d) commands the Atlanta City Attorney to seek judicial approval, in either state or federal court, of any decision to suspend a permit under § 18. Section 18(e) provides that unless the court chosen by the City Attorney validates the suspension within ten days, the permit must be provisionally restored until it does. (Section 4 of the ordinance provides that if an applicant for a permit certifies that the permit "is required by a specified time in order to be effective . . . the Commissioner shall issue a permit within the time requested . . . ." Under a possible, although strained, interpretation of the ordinance, this provision would apply to a permit revocation under § 18; if it did, then a permit could not be suspended at all without either judicial approval or some form of consent. This interpretation of the ordinance would not change our analysis.)
 These provisions have very little effect on the justiciability of appellants' claim. They do no more than assure permit holders that if Atlanta proposes to enforce the penalty provisions of § 18 against them, they will have a forum in which to raise their constitutional objections. This is no novelty. Routinely, a party can challenge the constitutionality of a measure being enforced against him or her; the challenge is usually raised in the enforcement forum itself. A criminal defendant, for example, can defend by alleging the unconstitutionality of the statute under which he or she is charged. When we permitted appellants' anticipatory challenge to the constitutionality of § 9(a) and to the solicitation booths provisions, we were fully aware that the same constitutional claims could be raised as defenses if those provisions were ever enforced against appellants. Similarly, appellants' right under § 18(d) and § 18(e) to demand judicial review of the constitutionality of § 18 if it is enforced against them does not make their anticipatory challenge any less justiciable.
 
 
 [13]
 Even if other applicants are now competing with the appellants, the Commissioner may never have to invoke his authority; the dispute may be resolved by mutual agreement. See Rogers v. Brockette, 588 F.2d 1057, 1061 (5th Cir. 1979). But while this may affect the policy considerations bearing on justiciability, See pp. 818-819 Supra, it is not relevant to the existence of a case or controversy; as we discussed, See pp. 822-823 Supra, the mere existence of excessive low-level administrative discretion, amounting to a power to censor, inflicts an injury on those subject to it
 
 
 [14]
 Appellee says, in his brief, that other groups solicit at the Atlanta Airport, Appellee's Br. at 17; but there is no indication that they compete for space with the Society
 
 
 [15]
 The district court found that the Society imposes on its members a religious duty to solicit funds. As we said, See p. 820 Supra, this duty naturally implies an obligation to solicit as effectively as possible; by limiting donations to solicitation booths, Atlanta has directly interfered with appellants' ability to practice their religion. Because this is the injury which appellants allege, we need not resolve the problem posed by cases like Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), and perhaps cast in a new light by Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) whether, and to what extent, the first amendment protects a religious group in soliciting funds not because any canon of religious duty requires it but solely because the religion needs the funds to prosper, or to survive
 
 
 [16]
 See also Stone, Restrictions of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions, 46 U.Chi.L.Rev. 81, 82-100 (1978)
 
 
 [17]
 See Ely, Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis, 88 Harv.L.Rev. 1482, 1496-98 (1975)
 
 
 [18]
 See Ely, Supra note 17, at 1496-502
 
 
 [19]
 In addition, if Atlanta treats commercial exchanges of money differently from exchanges that serve some religious or political purpose, it may be discriminating against expression on the basis of its content. See p. 827 Supra ; Compare Police Dep't v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), With Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (plurality opinion). But the city denies that it discriminates in this way, Appellee's Br. at 21, and there is no evidence that it does
 
 
 [20]
 We express no opinion about whether such a regulation might impermissibly classify speech on the basis of its content. See p. 827, Supra
 
 
 [21]
 Because we resolve the issue in this way, we need not consider the effect on appellants' overbreadth claim of the principle that "particularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973)
 
 
 [22]
 "(S)tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser." Smith v. California, 361 U.S. 147, 151, 80 S.Ct. 215, 217-8, 4 L.Ed.2d 205 (1959)
 
 
 [23]
 It is, of course, unconstitutional for a state or city to enforce a statute or ordinance in a way that could not have been reasonably foreseen; the measure would be vague as applied. See, e. g., Palmer v. City of Euclid, 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971); Angelico v. Louisiana, 593 F.2d 585 (5th Cir. 1979)
 
 
 [24]
 Thornhill held that for this reason the Alabama statute reached protected expression and was overbroad. Our conclusion, by contrast, is that the difficulty of deciding which of the several interpretations of § 9(a) is correct renders it unconstitutionally vague and, therefore, invalid on its face. We do not reach the question of overbreadth. See p. 830 Supra
 
 
 [25]
 Section 18(a) also "terminate(s) the authority of such person to conduct activities and solicitations pursuant to any permit held by an organization which he represents."
 
 
 [26]
 As we discussed, note 12 Supra, Sections 18(d) and (e) ensure that no permit will be suspended for more than ten days unless a court approves the suspension. This provision provided an argument against our deciding the constitutionality of § 18, but is irrelevant to the merits; if we were to uphold § 18, a court deciding the lawfulness of any § 18 suspension of appellants' permits would be precluded from reconsidering the constitutional question and would, under the plain words of § 18, have to approve the suspension if appellants had in fact been convicted of violating the ordinance
 
 
 [27]
 See L. Tribe, American Constitutional Law § 12-33 (1978)
 
 
 [28]
 It has never been suggested that the deprivation of first amendment rights may be used as a punishment for an offense, and both we, See e. g., Universal Amusement Co. v. Vance, 587 F.2d 159 (5th Cir. 1978) (en banc), and the Supreme Court, See, e. g., Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), have invalidated statutes that could probably have been justified in this way. See also Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (prisoners may not be denied first amendment rights except to extent that prison's institutional needs require it); Rudolph v. Locke, 594 F.2d 1076, 1077 (5th Cir. 1979) (same); Case Comment, Indigent Prisoner Defendants' Rights in Civil Litigation, 90 Harv.L.Rev. 1029, 1033-34 (1977). But cf. United States v. Smith, 414 F.2d 630, 636 (5th Cir. 1969), Rev'd in part on other grounds sub nom. Schacht v. United States, 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970) (probation can be conditioned on defendant's relinquishing first amendment rights, since defendant "chose to enjoy the benefits of probation.")
 
 
 [29]
 In McDonald v. Oliver, 525 F.2d 1217 (5th Cir. 1976), Cert. denied, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1977), we dismissed an appeal because the claim had become moot after the district court's decision. Id. at 1225, 1233. "The established practice," United States v. Munsingwear, Inc., 340 U.S. 36, 39, 71 S.Ct. 704, 95 L.Ed. 36 (1950), however, is to vacate the district court's judgment and remand with instructions to dismiss. See id. at 39 & n. 2, 71 S.Ct. 36