70 F.3d 1474
 DAYTON AREA VISUALLY IMPAIRED PERSONS, INC., an Ohio
Non-Profit Corporation; Wayne County Foster Parents
Network, an Unincorporated Ohio Non-Profit Association;
Ohio Telemarketing Association, Inc., an Ohio Non-Profit
Corporation, Plaintiffs-Appellants/Cross-Appellees,
v.
Lee FISHER, Attorney General, State of Ohio,
Defendant-Appellee/Cross-Appellant,
J. Anthony Sawyer, City Attorney of the City of Dayton,
Ohio; Lee J. Falke, Prosecuting Attorney,
Montgomery County, Ohio, Defendants-Appellees.
 Nos. 93-3977, 93-3979.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 20, 1995.
Decided Nov. 16, 1995.
 
 Richard Saphire, Dayton Law School, Dayton, OH, Louis A. Jacobs, Columbus, OH, Barry A. Fisher (argued and briefed), Fleishman, Fisher & Moest, Los Angeles, CA, for Dayton Area Visually Impaired Persons, Inc., Wayne County Foster Parents and Ohio Telemarketing Association, Inc.
 Noelle T. Tsevdos (briefed), Office of the Attorney General for the State of Ohio, Columbus, OH, Richard Cardray (argued and briefed), Grove City, OH, Jeffrey S. Sutton, State Solicitation Administration, Columbus, OH, for Lee Fisher.
 Kenneth Eugene Barden, Office of the City Attorney, Dayton, OH, for J. Anthony Sawyer.
 Before: ENGEL, NORRIS, and DAUGHTREY, Circuit Judges.
 DAUGHTREY, J., delivered the opinion of the court, in which ENGEL, J., joined. NORRIS, J. (p. 1490), delivered a separate opinion concurring in part and dissenting in part.
 DAUGHTREY, Circuit Judge.
 
 
 1
 This interlocutory appeal stems from the district court's order both granting and denying injunctive relief in response to First Amendment and equal protection challenges to Ohio's recently enacted charitable solicitation statutes. The suit, seeking declaratory and injunctive relief, was brought by three plaintiffs, Dayton Area Visually Impaired Persons, Inc. ("DAVIP"), the Wayne County Foster Parents Network, and the Ohio Telemarketing Association, against the defendants, principally Lee Fisher, then the Ohio Attorney General.
 
 
 2
 In their complaint, the plaintiffs alleged that selected portions of the Ohio Charitable Solicitation Act violate the First and Fourteenth Amendments' guarantees of free speech and non-establishment of religion. The district court agreed with the plaintiffs that four discrete portions of the statutes relating to charitable fundraising were unconstitutional and should not be enforced. In all other respects, the district court refused to issue a preliminary injunction that would effectively invalidate the statutes' provisions. Both the plaintiffs and the defendants appeal to this court from those portions of the district court order decided adversely to their positions. For the reasons detailed in this opinion, we affirm the judgment of the district court.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 The Statute
 
 3
 In 1990, the Ohio General Assembly passed a comprehensive revision of the Ohio's charitable solicitation law, codified as Chapter 1716 of the Ohio Revised Code and as Sec. 2901.32 of the Code, in an effort to curtail fraudulent activities in the solicitation of charitable donations. Pursuant to the act, all non-exempt charitable organizations in the state intending to solicit contributions must file with the attorney general a registration form containing, among other things, the names, addresses, and phone numbers of directors and officers, financial information from the prior fiscal year, and "[a]ny other information that the attorney general may, by rule, require." O.R.C. Sec. 1716.02(B) (emphasis added). Furthermore, those entities required by the act to register with the state must also provide annual financial reports on forms prescribed by the Attorney General, O.R.C. Sec. 1716.04, and must pay a registration fee between $50 and $200, according to a set scale, if the charitable organization received at least $5000 in contributions in the last fiscal or calendar year. O.R.C. Sec. 1716.02(D)(1). Exempt from the registration requirements, however, are various educational and charitable organizations meeting certain stated criteria and "any religious agencies and organizations." O.R.C. Sec. 1716.03.
 
 
 4
 Professional solicitors are prohibited by O.R.C. Sec. 1716.07 from engaging in any solicitation in the state until they have registered with the Attorney General, submitted a required $200 fee, and obtained a surety bond in the amount of $25,000. Moreover, such solicitors are required to provide certain general and financial information on an application, as well as "any other information that the attorney general may require," and must submit "a full and fair description of the charitable program for which the solicitation campaign is being carried out." The same section of the statute also contains certain record-keeping requirements and prohibits service as a professional solicitor by anyone who has been convicted within the five previous years of any felony or of a prior violation of the Charitable Solicitations Act. Professional solicitors are further required by the provisions of O.R.C. Sec. 1716.07(F) to collect contributions solely in the name of the charitable organization on whose behalf the contribution was solicited and, within two days of receiving the donation, to deposit the entire amount of the contribution into a bank account under the sole control of the charitable organization.
 
 
 5
 Pursuant to O.R.C. Sec. 1716.08, the act imposes a duty on professional solicitors to include certain provisions in their contracts with charitable organizations. Specifically, such contracts must specify the percentage of gross revenue from a solicitation campaign that a charity will receive and the percentage of gross revenue that the solicitor will claim as compensation. Furthermore, at the point of solicitation, prior to requesting a contribution verbally, and at least contemporaneously with a written request for a contribution, a professional solicitor is required by the provisions of O.R.C. Sec. 1716.08(B) to reveal the solicitor's name, the fact that the solicitor is a professional solicitor, and the name and address of the charitable organization on whose behalf the solicitation is being conducted. If the person being solicited requests information regarding the percentage of gross revenue the charity will receive from the campaign, the solicitor must respond truthfully to that inquiry. This section of the statute also provides that a professional solicitor may not represent that tickets to an event will be donated to other individuals unless the solicitor has, prior to initiation of the solicitation campaign, received written commitments from the persons who will use the tickets and has filed those written commitments with the attorney general.
 
 
 6
 Whoever violates a provision of the statute, or any rule promulgated thereunder, is guilty of the misdemeanor of solicitation fraud. O.R.C. Sec. 1716.99(A). A second violation of the statute or an applicable rule subjects the violator to conviction of grand solicitation fraud, a felony of the third degree. Moreover, each solicitation in violation of the provisions of O.R.C. Sec. 1716 constitutes a separate offense of solicitation fraud. Finally, failure to abide by the requirements of the statute subjects a violator to civil penalties of up to $10,000 per violation, costs, and attorney's fees. O.R.C. Sec. 1716.16(B).
 
 
 7
 Also at issue in this matter are the provisions of O.R.C. Sec. 2901.32, a statute seeking to regulate the improper solicitation of contributions for the purpose of distributing information relating to missing children, which appears to have been added to the 1990 legislation as an after-thought. Pursuant to the terms of that enactment, no organization may solicit such contributions unless it has been incorporated as a nonprofit corporation for at least two years, has been exempt from federal income taxes pursuant to Sec. 501(a) of the Internal Revenue Code for at least two years, and "does not use fund-raising counsel, professional solicitors, commercial co-venturers, or other charitable organizations" for soliciting funds from the public. O.R.C. Secs. 2901.32(A)(1)-(3).
 
 The Parties
 
 8
 DAVIP is a non-profit corporation whose purpose it is to educate, benefit, and offer support and information to visually impaired individuals. Because the organization cannot afford an in-house staff to raise the funds necessary for the corporation to carry out its objectives, DAVIP has, in the past, relied upon professional solicitors to seek contributions for the work of the corporation.
 
 
 9
 The Foster Parents Network is an unincorporated association of individuals committed to providing training, advocacy, and support for foster parents and foster children. Like DAVIP, this group has, because of its limited resources and organization, decided to retain the services of a professional solicitor to assist it in its fund-raising activities.
 
 
 10
 The Ohio Telemarketing Association is a non-profit corporation whose members include professional solicitors who engage in fund-raising on behalf of charitable and non-profit organizations in Ohio. The Association brings this action on behalf of its members, who contend that their ability to represent charitable organizations is substantially diminished as a result of the statutory requirements enforced by the defendants.
 
 
 11
 The principal defendant is the Ohio Attorney General, who championed passage of the new charitable solicitation regulations in the Ohio legislature, after they had been drafted and promulgated by the National Association of Attorneys General as a "model act." Also named as defendants in the suit, but not participating significantly in this appeal, are two local officials vested with certain enforcement responsibilities by the charitable solicitation statute.
 
 The District Court Proceedings
 
 12
 After the filing of the plaintiffs' complaint, the defendants moved the district court to dismiss this matter for failure to state a claim upon which relief could be granted. The district court closely examined the allegations of the plaintiffs and the applicable law and determined that the plaintiffs could prove no set of facts entitling them to relief on some of their attacks on the provisions of O.R.C. Secs. 1716 and 2901.32. In its extensive order in this matter, the district court did conclude that the plaintiffs should be granted a preliminary injunction on other claims alleging infringement of First Amendment rights. In particular, the district court ruled that the plaintiffs demonstrated a substantial likelihood of success on the merits of their claims that their free speech rights were unconstitutionally restricted by the provisions of the charitable solicitation statutes that required submission of "any other [registration] information that the attorney general may require," O.R.C. Sec. 1716.07(B), and that required submission of a "full and fair description" of the solicitation campaign, O.R.C. Sec. 1716.07(D)(2)(f). Furthermore, the district court concluded that the plaintiffs were likely to succeed in their attempt to establish that restrictions on speech regarding the use of donated tickets, O.R.C. Sec. 1716.08(D), and on solicitation of funds for distribution of materials regarding missing children, O.R.C. Sec. 2901.32, violated the First and Fourteenth Amendments to the United States Constitution.
 
 ANALYSIS
 
 13
 Appealability of Issues Dismissed by District Court
 
 
 14
 As stated previously, the district court granted in part the defendants' motion to dismiss the claims brought by the plaintiffs. The attorney general now argues that this court is without jurisdiction to review those elements of the plaintiffs' claims that were dismissed, because that dismissal did not effectively end the litigation on the merits.
 
 
 15
 In Carson v. American Brands, Inc., 450 U.S. 79, 83, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981), the Supreme Court noted that "[t]he first Judiciary Act of 1789, 1 Stat. 73, established the general principle that only final decisions of the federal district courts would be reviewable on appeal." (Emphasis in original.) Thus, "[a] party generally may not take an appeal under [28 U.S.C.] Sec. 1291 until there has been a decision by the district court that 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " Van Cauwenberghe v. Biard, 486 U.S. 517, 521, 108 S.Ct. 1945, 1949, 100 L.Ed.2d 517 (1988) (quoting Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633-34, 89 L.Ed. 911 (1945)). In 28 U.S.C. Sec. 1292(a)(1), however, Congress has fashioned a limited exception to the general rule. Pursuant to that statute, in pertinent part, "[i]nterlocutory orders of the district courts ... granting, continuing, modifying, refusing or dissolving injunctions" may be appealed to the courts of appeals. In order for such interlocutory orders to be appealable, however, a litigant must demonstrate that the district court's order "might have a 'serious, perhaps irreparable, consequence,' and that the order can be 'effectively challenged' only by immediate appeal." Carson, 450 U.S. at 84, 101 S.Ct. at 996-97; Sims Varner & Associates, Inc. v. Blanchard, 794 F.2d 1123, 1126 (6th Cir.1986).
 
 
 16
 In this case, the district court's order dismissing some of the plaintiffs' claims also constituted a refusal to grant the requested injunctive relief sought by the parties. Moreover, such a denial "might have a 'serious, perhaps irreparable, consequence' " because, as recognized in Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689-90, 49 L.Ed.2d 547 (1976) (plurality opinion), "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Furthermore, the possibility of such irreparable damage necessitates immediate redress to this court. Consequently, although the partial grant of the defendants' motion to dismiss did not constitute a final resolution of all issues raised by the plaintiffs, the effective refusal to grant requested injunctive relief that could prevent irreparable harm justifies the exercise of appellate jurisdiction by this court over all aspects of the plaintiffs' appeal.
 
 Standard of Review
 
 17
 This court reviews a challenge to the grant or denial of a preliminary injunction under the abuse of discretion standard and accords great deference to the decision of the district court. Washington v. Reno, 35 F.3d 1093, 1098 (6th Cir.1994). The district court's determination will thus be disturbed "only if the district court 'relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard.' " Id. (quoting Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150, 153 (6th Cir.1991)).
 
 Review of District Court's Determinations
 
 18
 In deciding whether to issue a preliminary injunction, a district court must consider:
 
 
 19
 (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction.
 
 
 20
 Washington v. Reno, 35 F.3d at 1099. Those four considerations are, however, "factors to be balanced, not prerequisites that must be met. Accordingly, the degree of likelihood of success required may depend on the strength of the other factors." In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir.1985).
 
 A. Likelihood of Success on the Merits
 
 21
 In determining whether the district court abused its discretion in granting a partial preliminary injunction to the plaintiffs, we must first examine the likelihood that the plaintiffs could succeed on the merits of each of the claims made before the district court. Any examination of the merits of a challenge to restrictions on charitable solicitation must begin with a review of the applicable principles of law set forth in the Supreme Court's decisions in Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); Secretary of State of Maryland v. Joseph H. Munson Co., Inc., 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); and Riley v. National Federation of the Blind of North Carolina, Inc., 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). In those cases, the Supreme Court affirmed that solicitations to pay or contribute money, because they are so intertwined with speech, are entitled to protection under the First Amendment. Riley, 487 U.S. at 787-89, 108 S.Ct. at 2672-74; Joseph H. Munson Co., 467 U.S. at 959-960, 104 S.Ct. at 2848-49; Schaumburg, 444 U.S. at 632-33, 100 S.Ct. at 833-34. Furthermore, that speech is not entitled to less protection simply because the speaker is compensated for the message. Riley, 487 U.S. at 801, 108 S.Ct. at 2680. Consequently, statutes attempting to restrict such speech must be narrowly tailored to achieve an important governmental interest without unnecessary infringement of First Amendment freedoms. Id. at 788, 108 S.Ct. at 2673.
 
 
 22
 The Supreme Court's trilogy of solicitation cases also makes clear, however, that some speech by professional fundraisers can be regulated without violating First Amendment principles. In the three decisions, for example, the Court recognized that a statute or regulation "may constitutionally require fundraisers to disclose certain financial information" or fulfill mandated registration requirements. Id. at 795, 108 S.Ct. at 2676-77; Munson, 467 U.S. at 967 n. 16, 104 S.Ct. at 2852 n. 16; Schaumburg, 444 U.S. at 637-38, 100 S.Ct. at 836-37.
 
 
 23
 Before this court, the plaintiffs now argue that the provisions of the relevant Ohio regulatory program fall short of the constitutionally mandated protections for speech involving solicitation of funds. The defendants, on the other hand, contend that the challenged statutory provisions are narrowly tailored to address the government's important interests in preventing fraud and maintaining the public confidence in the benefits of charitable giving.
 
 
 24
 1. Discrimination Against Small and Unpopular Charities
 
 
 25
 The plaintiffs first contend that the registration and reporting requirements of O.R.C. Sec. 1716 unconstitutionally discriminate against small and unpopular charities and in favor of larger, well-established charities. Because the alleged discrimination purportedly infringes upon the fundamental right to speak freely, the plaintiffs insist that any statute recognizing distinctions between such groups must be strictly scrutinized to ensure that the legislation reflects a compelling governmental interest that is narrowly tailored to accomplish its purposes.
 
 
 26
 The district court found that the different treatment accorded large and small charities did not implicate a suspect classification or a fundamental right. Consequently, the court applied a lessened level of scrutiny to the legislation and concluded that the statutory requirements were rationally related to the government's interest in protecting its citizens from fraud.
 
 
 27
 Strict scrutiny need be applied to legislative classifications only when "the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). As noted by the district court in its order in this case, the distinction between large and small charities does not implicate a suspect class. In fact, the plaintiffs are mistaken in their contention that small charities are necessarily singled out by O.R.C. Sec. 1716 for different treatment than that received by larger charities. As made clear by the provisions of O.R.C. Sec. 1716.03(E), an organization that does not receive gross revenue, exclusive of grants or awards, in excess of $25,000 in its immediately preceding fiscal year is not subject to the registration and fee provisions of the statute. Thus, the smallest, and also presumably the least popular, of the charitable organizations are not affected by the alleged burdens of the statute. Instead, the operative distinctions drawn in the statute are between religious and non-religious organizations, between new and established organizations, and between organizations that solicit only from individuals with ties to the institution and organizations that make broader-based financial appeals.
 
 
 28
 Furthermore, the district court properly refused to evaluate this claim under a strict scrutiny standard based upon interference with the fundamental right to free speech simply because the plaintiffs were unable to establish such interference. Even if strict scrutiny were to be applied to an examination of a legislative classification between new and established charities or between charities that make targeted and general requests for donations, however, the Ohio Charitable Solicitations Act could withstand the plaintiffs' constitutional attack. The difference in treatment between the two groups set up by the statute is narrowly tailored to accomplish the compelling governmental interest in preventing fraudulent solicitations of the very individuals most disposed to contribute financial support in response to pleas for donations.
 
 
 29
 First, the additional requirements placed upon the selected group have not been shown by the plaintiffs to be unnecessarily burdensome or likely to restrict the speech of the organization. Also, the registration and fee requirements are of a limited duration (two years), if the organization can prove its charitable nature by qualifying as a Sec. 501(c)(3) entity for federal tax purposes. Until a charity can establish a track record as a legitimate organization able to oversee the proper transfer of funds from donors to deserving recipients, the relatively innocuous statutory requirements help ensure that citizens of the state are protected from fraudulent schemes by mandating that the requesting organizations provide vital information about their solicitations to the state attorney general.
 
 2. Religious Exemption
 
 30
 The statutory distinction drawn between religious and non-religious organizations is, however, more problematic. The plaintiffs contend that the blanket exemption for religious organizations and charities violates the establishment clause, as well as principles of free speech and equal protection. The district court concluded, however, that the challenged statutes satisfy the three-pronged test of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), for determining whether an Establishment Clause violation has occurred. Furthermore, the district court determined that the legislative enactments did not contravene constitutional requirements regarding equal protection of the law as applied to freedom of expression.
 
 
 31
 In Lemon, the Supreme Court announced the now-familiar analysis for deciding whether a statute or practice violates the Establishment Clause of the First Amendment. Under the Lemon analysis, a court must inquire whether the law at issue has a secular purpose, whether the law has "a principal or primary effect" that neither advances nor inhibits religion, and whether the law avoids excessive governmental entanglement with religion. Id. at 612-13, 91 S.Ct. at 2111-12. If so, the law does not contravene the prohibitions of the Establishment Clause.
 
 
 32
 Without question, the purpose of the Ohio charitable solicitation statute is secular in nature. Even though an exemption is offered for religious organizations, the legislation is intended to benefit the citizens of the state by regulating charities that solicit funds. See Larson v. Valente, 456 U.S. 228, 248, 102 S.Ct. 1673, 1685, 72 L.Ed.2d 33 (1982) ("[T]he State ... has a significant interest in protecting its citizens from abusive practices in the solicitation of funds for charity, and ... this interest retains importance when the solicitation is conducted by a religious organization."). " Lemon's 'purpose' requirement aims at preventing the relevant governmental decisionmaker ... from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." Corporation of Presiding Bishop v. Amos, 483 U.S. 327, 335, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987). No such intent is present in this case.
 
 
 33
 A challenged statute, in order not to violate the Establishment Clause, also must have a primary effect that neither advances nor inhibits religion. As noted in Corporation of Presiding Bishop, however, "[a] law is not unconstitutional simply because it allows churches to advance religion, which is their very purpose. For a law to have forbidden 'effects' under Lemon, it must be fair to say the government itself has advanced religion through its own activities and influence." Id. at 337, 107 S.Ct. at 2869 (emphasis in original). The statute at issue in this litigation does not evidence governmental advancement of religion merely because special consideration is given to religious groups. Id. at 338, 107 S.Ct. at 2869-70. In fact, the Supreme Court had stated that where the "government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, [there is] no reason to require that the exemption comes packaged with benefits to secular entities." Id. Additionally, while only religious organizations receive a blanket exemption from the statute's registration requirements, various secular groups also need not fulfill the registration and fee payment mandates. In fact, the attorney general's synopsis of the bill that became O.R.C. Sec. 1716 estimated that "the vast majority of charitable organizations in Ohio will be exempt from the registration and annual reporting requirements imposed by the Bill."
 
 
 34
 Finally, the religious exemption itself actually helps ensure that the government will not become unnecessarily entangled in religious affairs. By exempting religious charities and organizations, the State of Ohio absolves itself of the responsibility to examine the financial records of religious bodies and, as noted by the district court, "operates to distance government from knowledge of or involvement with the inner workings of religious organizations."
 
 
 35
 Once we have determined that the provisions of O.R.C. Sec. 1716 do not violate the Establishment Clause of the First Amendment, we must then decide whether that religious exemption nevertheless fails to afford equal protection of the laws to non-religious charities. In Corporation of Presiding Bishop, the Supreme Court, in resolving an equal protection challenge to the religious exemption to Title VII's prohibition against religious discrimination in employment, held:
 
 
 36
 In cases such as these, where a statute is neutral on its face and motivated by a permissible purpose of limiting governmental interference with the exercise of religion, we see no justification for applying strict scrutiny to a statute that passes the Lemon test. The proper inquiry is whether Congress has chosen a rational classification to further a legitimate end.
 
 
 37
 Id. at 339, 107 S.Ct. at 2870.
 
 
 38
 The district court concluded that the religious exemption in O.R.C. Sec. 1716.03 was rationally related to the legitimate governmental interest in preventing fraud. The court further held that "[t]he exemption is also consistent with the legislature's judgment that established organizations are less likely to commit fraud than those which are less established." Of course, skeptics might argue that the legislature's decision in this regard fails to recognize past abuses and the potential for future abuse in large-scale solicitation carried on in the name of religion. We live, moreover, in an age of mail-order ministers, and we have witnessed the nationwide proliferation of minor religious sects and cults. Obviously, the status of a solicitor as a "religious" charity or organization cannot guarantee with complete assurance the absence of fraudulent solicitation. Also, the religious exemption extends not only to established organizations of the type that had presumably gained the trust of the district court, but to "any religious agencies and organizations." (Emphasis added.)
 
 
 39
 Nevertheless, we cannot say that the district court abused its discretion in concluding that the plaintiffs were unlikely to succeed in establishing the lack of a rational basis for the Ohio legislature's blanket exemption of religious organizations from the registration requirements of the act. Moreover, the Supreme Court has specifically held that it is a legitimate governmental purpose merely to alleviate "significant governmental interference with the ability of religious organizations to define and carry out their religious missions." Corporation of Presiding Bishop, 483 U.S. at 339, 107 S.Ct. at 2870.
 
 3. Standards and Procedural Safeguards
 
 40
 The plaintiffs next contend that the challenged statute amounts to an improper prior restraint on speech and lacks adequate procedural safeguards. Specifically, the plaintiffs insist that the regulatory scheme places unbridled discretion in the hands of the attorney general and fails to establish appropriate time limits for reaching a decision on the completeness of the registration materials.
 
 
 41
 In FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 225-26, 110 S.Ct. 596, 604-05, 107 L.Ed.2d 603 (1990), the Supreme Court addressed the "two evils that will not be tolerated in" prior restraint situations. First, the Court noted that any scheme that places "unbridled discretion" in the hands of government officials in deciding whether to grant or deny a permit or license will be found unconstitutional. Second, "a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible." Despite the plaintiffs' protestations to the contrary, neither of these two evils are countenanced by the district court decision in this case.
 
 
 42
 As noted by the district court, the government does not have uncontrolled authority either to grant or to deny a license or permit. The regulatory scheme imposed by O.R.C. Sec. 1716 does not even envision the issuance of a permit or license. Upon submission of documentation specified in the statute, the organization involved is automatically qualified to solicit funds. Furthermore, the reporting requirements approved by the district court are not so vague as to evade understanding by individuals of ordinary intelligence.[1] Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972).
 
 
 43
 The plaintiffs attempt to bolster an otherwise meritless challenge to the statute by citations to three cases in which the courts involved found that the governmental entities responsible for overseeing the registration of solicitors did exercise unbridled discretion in deciding whether to issue "identifications," "solicitation certificates," or "religious registration certificates." See Hynes v. Mayor of Oradell, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); Conlon v. City of North Kansas City, 530 F.Supp. 985 (W.D.Mo.1981); Sylte v. Metropolitan Gov't of Nashville, 493 F.Supp. 313 (M.D.Tenn.1980). In all three of those cases, however, the governmental entities were required by statute to issue some sort of permit or identification to the applicant and the registration requirements either were not specific enough or were dependent upon a governmental determination of sufficiency. None of those defects are present, however, in the portions of O.R.C. Sec. 1716 upheld by the district court. As noted by the court in its ruling, "These sections of the statute require nothing from the attorney general other than ministerial actions. Judgment, discretion, evaluation are neither required nor permitted; there is no issuing, or withholding, of permits, licenses, approvals and authorizations based on the exercise of any judgment, discretion, or evaluation."
 
 4. Required Contractual Provisions
 
 44
 The plaintiffs submit that the statutory requirements that contracts between charitable organizations and professional fundraisers be in writing, clearly state the respective obligations of the parties, and contain the percentage of the gross revenue from the solicitation campaign that the charity will receive impermissibly burden the freedom of expression. In support of their argument on this issue, they refer this court to the Riley opinion of the Supreme Court.
 
 
 45
 In Riley, the Court did conclude that statutory limits on the fee percentage that a charity could pay to a professional fundraiser unconstitutionally restricted free speech because "there is no nexus between the percentage of funds retained by the fundraiser and the likelihood that the solicitation is fraudulent." Riley, 487 U.S. at 793, 108 S.Ct. at 2675-76. In this case, however, the challenged statute does not attempt to dictate an appropriate fee level to be included in the contract. Instead, the provisions of O.R.C. Sec. 1716.08(A) simply require the disclosure of such information so that interested individuals can make an informed decision on where to direct their charitable dollars. See also Famine Relief Fund v. West Virginia, 905 F.2d 747, 752 (4th Cir.1990) (state can require disclosure of percentage fee in contract because such information only provides greater detail and description to information already disclosed in financial statements that can be required by state law to be filed with a state agency). The district court did not abuse its discretion in concluding that the plaintiffs failed to demonstrate a substantial likelihood of success on the merits of this claim.
 
 5. Point of Solicitation Disclosures
 
 46
 Pursuant to the provisions of O.R.C. Sec. 1716.08(B), a professional solicitor, prior to requesting a contribution verbally, or at least contemporaneously with a written request for a donation, must provide the solicited individual with certain information. At the point of solicitation, the solicitor must disclose the solicitor's name and status as a professional fundraiser, the name and address of charities to receive the requested donation, and the charitable purposes to be advanced with the funds raised (if the charity is not registered as a Sec. 501(c)(3) entity). Additionally, if requested by the person being solicited, the fundraiser must inform the individual of the percentage of gross revenue that will be turned over to the charitable organization. The plaintiffs, again relying upon Riley, contend that such compelled speech violates the First Amendment.
 
 
 47
 In Riley, the Supreme Court invalidated a provision of a North Carolina statute that mandated, in all cases, disclosure of the percentage of charitable funds collected in the previous year that were actually turned over to charity. Id., 487 U.S. at 795-98, 108 S.Ct. at 2676-79. Although determining that such a requirement was not narrowly tailored to meet a compelling state interest, the Court noted that other, more narrowly drawn portions of the North Carolina statute allowed the state to accomplish the same goals. Specifically, the Court referred to unchallenged provisions of the statute that required disclosure of professional fundraising status and, upon request, the percentage of contributions submitted to the charity. Id., 487 U.S. at 799, 108 S.Ct. at 2679. In dicta, the Court stated:
 
 
 48
 The Act, as written, requires the fundraiser to disclose his or her employer's name and address. Arguably, this may not clearly convey to the donor that the solicitor is employed by a for-profit organization, for example, where the employer's name is "Charitable Fundraisers of America." However, nothing in this opinion should be taken to suggest that the State may not require a fundraiser to disclose unambiguously his or her professional status. On the contrary, such a narrowly tailored requirement would withstand First Amendment scrutiny.
 
 
 49
 Id. at 799 n. 11, 108 S.Ct. at 2679 n. 11. See also Famine Relief Fund, 905 F.2d at 751-52. Furthermore, the Court recognized:
 
 
 50
 And, of course, a donor is free to inquire how much of the contribution will be turned over to the charity. Under another North Carolina statute, also unchallenged, fundraisers must disclose this information upon request. N.C.Gen.Stat. Sec. 131C-16 (1986). Even were that not so, if the solicitor refuses to give the requested information, the potential donor may (and probably would) refuse to donate.
 
 
 51
 Riley, 487 U.S. at 799, 108 S.Ct. at 2679.
 
 
 52
 Although dicta, the comments made by the Supreme Court in Riley regarding "point of solicitation disclosures" provide insight into the Court's inclination regarding the legality of such requirements. In light of those statements, we cannot say that the district court abused its discretion in concluding that the plaintiffs failed to establish a substantial likelihood of success on the merits of this claim. This challenge to the district court's order is thus also without merit.
 
 6. Fee and Bond Requirements
 
 53
 In yet another challenge to the constitutionality of O.R.C. Sec. 1716, the plaintiffs contend that requiring non-exempt charities to pay a fee based on the amount of contributions received unduly burdens the exercise of free speech. Similarly, the plaintiffs contest the legality of assessing a fee and imposing a $25,000 bonding requirement on professional solicitors.
 
 
 54
 In Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), the Supreme Court upheld a state statute requiring payment of a licensing fee of not more than $300 before parading on public streets. The Court justified the burden imposed upon the exercise of First Amendment rights by recognizing the necessity of allowing a municipality to recoup its costs for the maintenance of order.
 
 
 55
 In 1943, the Court was again faced with a challenge to a law requiring payment of a fee as a condition of exercising free speech rights. Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). Because the flat fee at issue in Murdock was "unrelated to the scope of the activities of petitioners or to their realized revenues," the Court invalidated the requirement for payment of what amounted to a licensing tax. In discussing the reasons for striking down the ordinance, the Court also noted that it was "not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question." Id. at 113-14, 63 S.Ct. at 875-76.
 
 
 56
 Based upon that quoted language from the Murdock opinion, the district court in this case assumed that any fee imposed on the exercise of First Amendment rights must be nominal in order to withstand constitutional scrutiny. In fact, however, the Supreme Court has specifically rejected that idea and concluded that the ideas expressed in Murdock do not mean "that an invalid fee can be saved if it is nominal, or that only nominal charges are constitutionally permissible." Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 136-38, 112 S.Ct. 2395, 2405, 120 L.Ed.2d 101 (1992). Instead, the Court stated that "[t]he tax at issue in Murdock was invalid because it was unrelated to any legitimate state interest, not because it was of a particular size." Id.
 
 
 57
 In this matter, the district court found that the fees imposed upon charitable organizations, based upon their revenue in the prior year, "are related to the costs of administering the charitable solicitation statute" that seeks to deter fraud. Furthermore, because the bonding requirement imposed upon professional solicitors also attempts to deter fraud and to provide a fund from which to compensate charities for moneys lost or misappropriated by the professional solicitors, the district court concluded that the requirement was narrowly tailored to serve a legitimate state interest. Consequently, under the rationale advanced in Cox, Murdock, and Nationalist Movement, the plaintiffs have failed to establish, at this point in the proceedings, that the fee and bonding requirements of O.R.C. Sec. 1716 unduly burden their free speech rights. At the hearing on the plaintiffs' request for a permanent injunction, however, the plaintiffs will be free to introduce evidence that the fees charged under the statute are not intended or are not used to defray the state's administrative costs associated with the regulation of charitable solicitations and are, therefore, unconstitutional impediments to free speech.
 
 7. Bank Account Requirements
 
 58
 The plaintiffs next challenge the statutory requirement that professional solicitors deposit money collected for a charity into a bank account over which the charity has sole control. The plaintiffs argue, weakly, that such a mandate is paternalistic and that, although the state has a legitimate interest in seeing that the charity's funds are deposited into an account to which the charity is a signatory, there is no need to require the charitable organization to be the only signatory on the account.
 
 
 59
 As noted by the district court in its ruling on this issue, however, the challenged provision of the statute "regulates the control of funds received and access to those funds once they are deposited; it does not implicate speech rights at all." Thus, "it is difficult to imagine how this regulation may affect the content or frequency of any speech." The district court did not abuse its discretion in concluding that the plaintiffs have not shown a substantial likelihood that they could succeed on the merits of this attack on the charitable solicitation statute.
 
 8. Restrictions on Employment of Felons
 
 60
 Pursuant to the provisions of O.R.C. Secs. 1716.05 and 1716.07, individuals convicted within the previous five years of a felony or of a violation of the charitable solicitation laws may not be employed as a paid fundraising counsel or a professional solicitor. The plaintiffs challenge this restriction on employment as a prior restraint on speech that fails to pass constitutional muster.
 
 
 61
 In support of their position, the plaintiffs cite, among other cases, International Society for Krishna Consciousness v. Eaves, 601 F.2d 809 (5th Cir.1979). In that case, the Fifth Circuit had no difficulty in invalidating a provision of an Atlanta ordinance that rescinded, upon conviction of certain violations of the ordinance, a permit required to distribute literature or solicit funds in the Atlanta airport. The court concluded that the rescission provision "is simply a recipe for an unlawful prior restraint." Id., 601 F.2d at 832.
 
 
 62
 The provision at issue in this case is significantly different from the ordinance analyzed in International Society for Krishna Consciousness. Unlike the Atlanta ordinance, the Ohio charitable solicitation statute does not completely bar an individual from exercising protected First Amendment freedoms. While violation of the Atlanta law resulted in banishment from airport soliciting or literature distribution, conviction of a felony or solicitation offense under the Ohio law bars the individual only from serving as a paid solicitor. Other aspects of the exercise of free speech are unaffected. Moreover, as noted in dicta in Schaumburg v. Citizens for a Better Environment, decided after International Society for Krishna Consciousness, a "provision making it unlawful for charitable organizations to use convicted felons as solicitors ... may bear some relation to public safety." Schaumburg, 444 U.S. at 638, 100 S.Ct. at 836-37. Thus, we conclude that the district judge in this case did not abuse his discretion in concluding that the plaintiffs could not establish a substantial likelihood of success on this issue.
 
 9. Vagueness of Penalty Provisions
 
 63
 In their final challenge to the Ohio Charitable Solicitations Act in this appeal, the plaintiffs contend that the description of acts and practices that are prohibited by the statute is unconstitutionally vague and lacking in a scienter requirement. The district court disagreed and concluded that the statutory provisions were understandable by persons of ordinary intelligence and that Ohio law supplies a recklessness requirement in situations such as this where no explicit scienter standard is specified.
 
 
 64
 For statutes to survive a vagueness challenge, the Supreme Court requires "that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Grayned, 408 U.S. at 108, 92 S.Ct. at 2298-99. However, "[t]he degree of vagueness that the Constitution tolerates ... depends in part on the nature of the enactment." Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). "If, for example, the law interferes with the right of free speech ..., a more stringent vagueness test should apply." Id. at 499, 102 S.Ct. at 1193-94.
 
 
 65
 The plaintiffs point to examples of language contained in the challenged statute that they contend fail to meet "a more stringent vagueness test." For instance, they emphasize the phrase "representation that implies" and allege that persons of ordinary intelligence are not informed by those words of the conduct that is prohibited. In this example, as in their other examples, however, the plaintiffs fail to place the allegedly vague phrase in its proper context. Pursuant to the provisions of O.R.C. Sec. 1716.14(A)(3), persons are prohibited from "[u]sing any representation that implies that the contribution is for or on behalf of a charitable organization, or using any emblem, device, or printed matter belonging to or associated with a charitable organization, without first having been authorized in writing to do so by the charitable organization." Read in that context, the phrase highlighted by the plaintiffs is not vague but, rather, clearly gives "the person of ordinary intelligence a reasonable opportunity to know what is prohibited." Likewise, all other examples of allegedly vague statutory provisions cited by the plaintiffs are, when placed in proper context, sufficiently clear to withstand review under even a stringent vagueness test.
 
 
 66
 Similarly without merit is the plaintiffs contention that the statute is unconstitutionally vague because it lacks a specified scienter requirement in regard to many of the practices or acts prohibited in the enactment. As noted by the district court, O.R.C. Sec. 2901.21(B) provides that when a criminal statutory "section neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense."
 
 
 67
 The plaintiffs insist that Sec. 2901.21(B) has application only to criminal statutes and, therefore, does not provide a sufficient scienter requirement for the statutorily prohibited civil violations. Because a heightened level of mens rea is required in criminal acts that pose a possibility of loss of liberty, adoption of the criminal standard of culpability for those portions of Sec. 1716 that impose civil liability would be sufficient to satisfy the requirements of due process. The plaintiffs are thus unlikely to succeed on the merits of this claim.
 
 
 68
 10. Required Written Commitment for Donated Tickets
 
 
 69
 Pursuant to the provisions of O.R.C. Sec. 1716.08(D), a professional solicitor may not represent that tickets to charity events purchased, but unused, by contributors will be donated to others unless written commitments from the intended ticket recipients stating their intentions to use a specified number of the tickets are already on file with the attorney general. The district court preliminarily enjoined enforcement of this portion of the Ohio Charitable Solicitations Act, after determining that the provision amounted to a content-based restriction on speech that was not narrowly tailored to serve a compelling state interest. Before this court, the Ohio Attorney General contends that the district court erred in so ruling because the statute is a narrowly drawn attempt to prevent solicitation of contributions on false pretenses.
 
 
 70
 Any content-based restriction on speech "is subject to exacting First Amendment scrutiny" to ensure that the means chosen are not unduly burdensome and are narrowly tailored to serve the purposes for which the restriction was enacted. Riley, 487 U.S. at 798, 108 S.Ct. at 2678-79. The restrictions contained in O.R.C. Sec. 1716.08(D) are clearly content-based because they apply only to one type of speech, efforts to "represent that tickets to any event will be donated for use by another person." As noted by the district court in this case, moreover, the justifications offered by the defendant for the restrictions, while laudable, are not the type of compelling interests justifying the infringement on the right of free speech. Additionally, the provisions of the statute are not so narrowly drawn as to exclude from the restriction those solicitors that the provision did not intend to reach.
 
 
 71
 In support of the statutory scheme, the defendant argues that the challenged provisions assure that solicitors have a charitable beneficiary in mind prior to representing to donors that eleemosynary functions will be undertaken. Furthermore, the restrictions and filing requirements prevent solicitors from "dumping" unwanted or unusable tickets upon a group that has not received sufficient advance notice of the donation to make use of the gift. The district court correctly determined, however, that the statute's provisions, rather than merely regulating behavior to ensure fulfillment of the governmental goals, actually proscribe certain speech. As the district judge noted, "The state has other means of regulating the speaker's conduct: should the solicitor commit fraud, he may be investigated, charged, and convicted for that crime, or the state may prescribe the precise steps with which a solicitor must comply when attempting to donate tickets to charity." See McIntyre v. Ohio Elections Comm'n, --- U.S. ----, ----, 115 S.Ct. 1511, 1524, 131 L.Ed.2d 426 (1995) ("The State may, and does, punish fraud directly. But it cannot seek to punish fraud indirectly by indiscriminately outlawing a category of speech, based on its content, with no necessary relationship to the danger sought to be prevented.").
 
 
 72
 Because we find that the statutory provisions were not narrowly tailored to serve compelling state interests, we conclude that the district court did not abuse its discretion in concluding that the plaintiffs had a substantial likelihood of succeeding on the merits of their First Amendment claim in this regard. Consequently, the district court properly ordered that enforcement of the provisions of O.R.C. Sec. 1716.08(D) be preliminarily enjoined.
 
 
 73
 11. Limits on Solicitations for Distribution of Information
 
 Concerning Missing Children
 
 74
 The Ohio legislature, as part of the same bill that contained O.R.C. Sec. 1716 (1990 House Bill 486), passed what was later codified as O.R.C. Sec. 2901.32. Pursuant to subsection (A) of that statute, no organization may solicit funds "for the purpose of distributing materials containing information relating to missing children" without meeting certain requirements. Specifically, any such solicitor, without exception, must have been incorporated as a non-profit corporation for two years prior to the solicitation, must have been exempt from federal income taxes for two years prior to the solicitation, and must not use fundraising counsel, professional solicitors, commercial co-venturers, or other charitable organizations to solicit the contributions.
 
 
 75
 In resolving the plaintiffs' challenge to the constitutionality of the statute, the district court succinctly concluded that the provision was a content-based restriction on speech and that the state could identify no legitimate compelling interest to be served by the restriction. As a result, the court decided that the plaintiffs had demonstrated a substantial likelihood of success on the merits of their challenge to that statutory requirement.
 
 
 76
 The defendant recognizes that O.R.C. Sec. 2901.32 enacts content-based restrictions on speech. The state attempts to justify those burdens, however, by arguing that the State of Ohio has a compelling interest in protecting its children and that in order to provide such protection, the free speech rights of others may be sacrificed.
 
 
 77
 It is indisputable that state governments have important interests in seeking to secure the safety of their minor citizens. Unlike statutes prohibiting child pornography or statutes regulating access of juveniles to obscene material, however, O.R.C. Sec. 2901.32 does not regulate activity or speech in which children are participants. Instead, the speech that the state seeks to regulate is speech that merely concerns the plight of unfortunate children. An argument could even be advanced that if the state's interest in securing the return of missing children is such a compelling one, regulations should seek to increase, rather than restrict, the number of people and organizations attempting to distribute literature about the missing individuals. Although concern about solicitors preying on the good intentions of citizens interested in securing the return of children to their families may be justified, the challenged provisions of O.R.C. Sec. 2901.32 are not drawn narrowly enough to permit its blatant prior restriction on speech based solely on its content. The district court did not abuse its discretion in determining that the plaintiffs had a substantial likelihood of succeeding on the merits of their claim that O.R.C. Sec. 2901.32 impermissibly burdens the exercise of protected First Amendment freedoms.
 
 
 78
 B. Possibility of Irreparable Harm to the Plaintiffs
 
 
 79
 After examining a plaintiff's likelihood of success on the merits of their claims, a court must balance those conclusions and findings with other factors, including the possibility that denial of a preliminary injunction will cause irreparable harm to the plaintiff. In a plurality opinion, the Supreme Court has recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod, 427 U.S. at 373, 96 S.Ct. at 2689-90.[2] Consequently, to the extent that the plaintiffs have established a substantial likelihood that they could succeed on the merits of their First Amendment claims, they have also established the possibility of irreparable harm as a result of the deprivation of the claimed free speech rights.
 
 
 80
 C. Probability That Injunction Will Harm Others
 
 
 81
 Furthermore, the issuance of a preliminary injunction against enforcement of those sections of the challenged statutes upon which the plaintiffs have demonstrated a substantial likelihood of success on the merits would not result in significant harm to the defendant or to others. The four components of the preliminary injunction merely mandate that appropriate individuals cease enforcing certain challenged provisions of the law until such time as a federal court may rule, after a full hearing, on the merits of the plaintiffs' constitutional challenges.
 
 D. Advancement of the Public Interest
 
 82
 Finally, the public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties. Thus, the public interest would be advanced by issuance of a preliminary injunction enjoining enforcement of those portions of the challenged statutes that are of questionable constitutionality.
 
 CONCLUSION
 
 83
 The district court appropriately resolved the challenges raised by the plaintiffs to the charitable solicitation statutes at issue in this appeal. Furthermore, the court properly balanced the factors to be considered in determining whether to issue a preliminary injunction pending a full hearing on the merits of the claims raised in the litigation. After careful review, we therefore conclude that the judgment of the district court should be AFFIRMED.
 
 
 84
 ALAN E. NORRIS, Circuit Judge, concurring in part and dissenting in part.
 
 
 85
 While I concur with the conclusions reached by my colleagues in virtually every respect, I write separately because I believe that Ohio Rev.Code Ann. Sec. 1716.08(D), which requires professional solicitors to obtain written commitments for donated tickets, passes constitutional muster.
 
 
 86
 Assuming that the provision imposes a content-based restriction on speech, it is neither unduly burdensome nor overly broad in view of the state's compelling interest in ensuring that charitable solicitations are free from fraudulent representations.
 
 
 87
 The provision itself is certainly narrow inasmuch as it only affects those solicitors who use donated tickets as a means of increasing contributions. Further, the provision does not impose a limit on the number of tickets that can be given away; it merely requires that solicitors engage in a modicum of forethought by contacting the recipient organization before, rather than after, the fundraising campaign. Seen in this light, the burden, if any, imposed on solicitors is minimal when balanced against the state's interest in ensuring that the tickets are used as represented.
 
 
 
 [1]
 The district court did invalidate two provisions of the statute that vested unbridled discretion in the attorney general to determine the completeness of the filing of the charitable organization or professional solicitor. The court determined that requirements that entities submit "full and fair" descriptions of the charitable program, O.R.C. Sec. 1716.07(D)(2)(f), or "any other information that the attorney general may require," O.R.C. Sec. 1716.07(B), lacked the specificity required to protect First Amendment freedoms. The defendant Fisher does not appeal those limited rulings of the district court
 Interestingly, the plaintiffs rely on these two invalidated provisions to bolster their argument that the statute as a whole is vague and without sufficient standards. Other provisions and requirements of O.R.C. Sec. 1716 do not, however, suffer from the same malady as the subsections found to vest discretion in the hands of governmental entities.
 
 
 [2]
 Although admittedly expressed only in an opinion signed by three justices of the Court, the principle expressed in the quoted language is hardly open to serious disagreement